<span style="color:red">**Redacted Version**</span>

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

(Electronically filed on January 20, 2026)

| | |
|---|---|
| RICE SERVICES, INC. <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES <br><br> Defendant. | Case No. _____ <br><br> Judge _____ |

**COMPLAINT**

Plaintiff Rice Services, Inc. ("Rice") brings this bid protest against the United States, acting through the U.S. Department of the Army ("Army"), challenging the Army's unlawful override of the Competition in Contracting Act ("CICA") stay for dining facility attendant ("DFA") and cook support services at the United States Military Academy at West Point, New York ("West Point" or "USMA"), following Rice's timely bid protest filed with the Government Accountability Office ("GAO").

I.    **Introduction**

1.    Rice's pending GAO protest marks the ***fourth time*** Rice has been compelled to challenge the Army's unlawful sole-source award to Southern Foodservice Management, Inc. ("Southern")—and the ***third time*** Rice has been forced to contest the Army's continued unlawful sole-sourcing of this requirement ***after*** the Army represented to the GAO that it would "conduct a new competitive procurement for this award."

2.      Worse still, despite Rice's prior protests triggering automatic CICA stays, Southern's employees have repeatedly continued performing the challenged services on-site at West Point *without any CICA-compliant override*.  The Army's present override is the first instance in which the Army has apparently formally documented such a decision.  As discussed below, that belatedly documented override is prejudicially arbitrary and capricious and cannot withstand judicial scrutiny.

3.      Rice brings this protest before the Court because the Agency has *repeatedly* attempted to unlawfully procure DFA and cook support services from Southern on a sole-source basis and to commence or continue contract performance—openly disregarding CICA and Rice's protests at both the GAO and the Agency level.

4.      This Complaint, however, is narrowly focused.  It challenges only the propriety of the Agency's CICA override.  It does not contest the merits of the underlying sole-source decision, which remains pending before the GAO.

5.      Although the Agency unlawfully permitted Southern to continue performing at multiple junctures—*even while CICA stays were in effect*—the Agency never previously issued a formal override.  Only after Rice was compelled to file a third GAO protest did the Army finally formalize an override decision.  Yet even now, the Army has failed to provide key documents underpinning that analysis, further insulating its unlawful and anticompetitive conduct from scrutiny.

6.      In light of the Agency's repeated actions, it is apparent that the Army lacks any lawful or rational basis for the instant override—or, indeed, for the underlying sole-source award to Southern.  Accordingly, Rice challenges the implementation of the override and respectfully requests that the Court set it aside.

## II.    Nature of this Action

7.      On January 8, 2026, through a Undefinitized Contract Action ("UCA"), the Army secretly awarded sole-source Task Order W52P1J-19-D-0395 (the "Task Order") under a preexisting contract vehicle, directing that performance be subcontracted to Southern to provide DFA and cook support services at West Point.  *See* Exhibit 1.  Rice protested this secret award, both at the Agency-level and at the GAO, and the GAO protest remains pending.  In response to Rice's protests, the Agency issued an override to permit Southern to continue performing first during the pendency of the Agency-level protest and now during the pendency of the GAO protest.  The Agency's override decision is arbitrary, capricious, and unlawful, and the Court should enjoin its implementation.

## III.    Parties

8.      Rice is a small business corporation organized and existing under the laws of the State of Tennessee that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

9.      Defendant is the United States, acting by and through the U.S. Army Mission and Installation Contracting Command-Installation Readiness Center – (MICC-IRC), Fort Sam Houston, TX for the Army Sustainment Command, Rock Island, IL ("Army" or "Agency").

## IV.    Jurisdiction and Standing

10.      The Court has jurisdiction over this action pursuant to the Tucker Act because the case involves Rice's objection to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement."  28 U.S.C. § 1491(b).  As the Court has recognized, the phrase "in connection with" is "sweeping in scope."  *Nortel Gov't Sols., Inc. v. United States*, 84 Fed. Cl. 243, 247 (2008).  Because a CICA override is connected to the

3

underlying procurement, this Court has jurisdiction to review an agency's override decision. *See id.* Additionally, while the Court is generally limited under Federal Acquisition Streamlining Act ("FASA") in its ability to hear protests in challenging the award of a task order, FASA includes an exception that allows the Court to hear "a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued[.]" 41 U.S.C. § 4106(f)(1)(A). As this case reflects a CICA override claim, and the Agency's most recent attempt to award this procurement to Southern reflects a task order award that increases the scope of the underlying prime contract, this claim is squarely within the Court's jurisdiction.

11. Rice has standing because it is an interested party whose direct economic interest is harmed by the Agency's override of the CICA stay. Rice protested at the GAO the Agency's previous unlawful sole-source awards to Southern for these same services, and protested the Agency's instant Task Order award at both the Agency and the GAO. These timely protests triggered automatic stays under CICA, yet the Agency permitted Southern to continue to provide the challenged services, rather than abiding by the stay and engaging in an open procurement using competitive procedures. Ultimately, the Agency formalized its override decision in the most recent GAO protest. As a highly qualified offeror currently providing dining support services at West Point (Contract No. W911SD-22-C-0003), Rice would have competed for the opportunity to provide DFA and cook support services at West Point, and was deprived of this opportunity by virtue of the Agency's CICA override and repeated unlawful sole-source awards to Southern.

V.      **Factual Background**

A.      **Sole-Source Award of Letter Contract, First GAO Protest, and Purported Corrective Action.**

12.     On November 18, 2025, the Agency published a Justification and Approval for Other than Full and Open Competition ("J&A") announcing the sole-source award of Contract No. W5168W-26-C-A002 (the "Letter Contract") to Southern for DFA and cook support services at West Point. *See* Exhibit 2. In the J&A, the Agency stated that it had "a time sensitive need to provide cook and [DFA] augmentation support at West Point, New York," relying on the exception at FAR 6.302-2 for unusual and compelling urgency to justify the sole-source award. *Id.* at 3.

13.     In the November 18th J&A, the Agency represented that Southern was "the only vendor with the requisite knowledge and capabilities to perform the cook support DFA services on short notice at West Point." *Id.* at 3-4. The Agency ***did not*** contact any other potential service providers regarding their ability or willingness to perform the Letter Contract, nor did the Agency perform market research to support the award "due to the urgent nature of this procurement need." *Id.* at 4-5. The period of performance under the Letter Contract was set as November 12, 2025, to November 11, 2026. *Id.* at 3. However, despite the alleged urgency underlying the award, Southern was not anticipated to begin work on-site at West Point until January 2026.

14.     On November 21, 2025, Rice protested the unlawful sole-source award of the Letter Contract to Southern at the GAO, docketed as B-424105.1 (the "First Protest"). In its First Protest, Rice challenged the award on the basis that the Agency failed to establish an unusual and compelling urgency to justify the sole-source award; the Agency's purported

urgency was caused by its own failure to appropriately plan; the Agency did not consider as many sources as practicable under the circumstances; the length of the Letter Contract was greater than necessary; and the Agency did not sufficiency justify the sole-source award.

15.     In response to the First Protest, on December 19, 2025, the Agency submitted to the GAO a notice of voluntary corrective action.  Exhibit 3.  In that notice, the Agency represented:

> [T]he Army intends to take corrective action that will render the protest academic.
>
> As corrective action, the Army will terminate Letter Contract No. W5168W-26-C-A002 for the convenience of the government, and *the Army will conduct a new competitive procurement for this award*.  The Army reserves the right to take any additional actions that are necessary during the corrective action.

*Id.* (emphasis added).  In reliance on this representation, on December 22, 2025, the GAO dismissed the First Protest as academic.

### B.     Sole-Source Award of the Bridge Contract, Second GAO Protest, and Purported Corrective Action.

16.     On January 5, 2026, Rice discovered that Southern employees had begun providing DFA and cook support services at West Point—despite the Army's purported termination of the Letter Contract.  Upon further inquiry, Rice learned that the Agency had secretly awarded Southern a bridge contract on a sole-source basis for these same services. However, the Agency had not posted any public information regarding this award.

17.     On January 6, 2026, Rice protested the unlawful sole-source award of the unnumbered bridge contract to Southern at the GAO, docketed as B-424194.1 (the "Second Protest").  In this Second Protest, Rice again challenged the award on the basis that the Agency failed to establish an unusual and compelling urgency to justify the sole-source award and that the Agency's purported urgency was caused by its own failure to appropriately plan.  Rice further

6

challenged the Agency's failure to support the sole-source award with a J&A as well as the Agency's mischaracterization of the award as a "bridge contract."

18.     Following the filing of the Second Protest, on January 6, 2026, Rice contacted the Agency to confirm that the CICA stay was appropriately implemented.  In response, however, the Agency indicated that it **had not** implemented the stay and was contemplating pursuing an override of the CICA stay.  In light of the Agency's representation, on January 7, 2026, Rice filed a Pre-Filing Notice as required by Appendix C of the Rules of the U.S. Court of Federal Claims.

19.     Ultimately, the Agency did not pursue a formal CICA override, presumably because it has no lawful basis to do so.  The Agency belatedly implemented the required CICA stay midday on January 7, 2026.

20.     On January 6, 2026—the same day the Second Protest was filed—the Agency quietly published a justification and approval ("J&A") announcing the sole-source award of Contract No. W5168W-26-C-A004 (the "Bridge Contract") to Southern for DFA and cook support services at West Point, thereby circumventing the stay that was triggered by Rice's Second Protest.  *See* Exhibit 4.  The January 6th J&A revealed that the Contracting Officer had begun secretly preparing the J&A as early as December 9, 2026, and had quietly signed the J&A on December 15, 2026—four days *before* the Agency filed its notice of corrective action in the First Protest.  *Id.* at 1, 9.  Despite this, the Agency's notice of corrective action in the First Protest conspicuously made *no* mention of the Agency's intention to issue the sole-source Bridge Contract.

21.     In the January 6th J&A, the Agency indicated that the sole-source award was justified due to purported "unusual and compelling urgency" for cook support and DFA services at West Point, pursuant to FAR 6.302-2.  The J&A reasserted the same Agency-created urgency

that it had asserted when issuing the November 18th J&A for the Letter Contract. *See id.* at 4-7. In addition, the January 6th J&A indicated that "[t]his urgent action . . . is necessitated by the Government's receipt of a post-award protest (GAO Protest Number B-424105) regarding contract W5168W-26-C-A002." *Id.* at 5. Again, the Agency incorrectly identified Southern "as the only vendor with the requisite knowledge and capabilities to perform the cook support DFA services on short notice at West Point." *Id.* Again, the Agency ***did not*** contact any other potential service providers regarding their ability or willingness to perform the Bridge Contract, nor did the Agency perform market research to support the award "due to the urgent nature of this procurement need." *Id.* at 5-7.

22.    In the January 6th J&A, the Agency further explained that the sole-source Bridge Contract was issued to Southern pending the Agency internally procuring the necessary services, stating:

> The U.S. Army Sustainment Command (ASC) has Exception to Policy (ETP) approval for hiring authority to onboard additional DAC food service staff; however, recruitment will take time. . . .
>
> The letter contract resulting from this J&A will cover only the minimum period of performance necessary. West Point anticipates it will regain the ability to hire civilian employees. Once the facility can be re-staffed so it can meet capacity, it is not anticipated that additional contract support will be required.

*Id.* at 4, 7.

23.    On January 8, 2026, the Agency filed a notice of voluntary corrective action in the Second Protest. In the request, the Agency represented that:

> As part of corrective action, the Army has stopped work on the protested bridge contract and intends to terminate the contract in accordance with FAR 33.104(c)(1). The Army will reassess this requirement and the current acquisition strategy. After this review, the Army will procure the needed services in accordance with the reassessed acquisition strategy.

Exhibit 5. In the Contracting Officer's Memorandum attached to the request, the Agency further represented that:

> Although it is not part of this corrective action, which concerns only the protested short-term bridge contract, *we will separately continue our ongoing corrective action in response to Rice Services, Inc.'s earlier GAO protest, B-424105.1*, which GAO dismissed as academic on December 22, 2025.

Exhibit 6 (emphasis added).

24. In light of this representation, the GAO dismissed the Second Protest as academic on January 14, 2026.

### C. Task Order Award and Agency-level Protest

25. On January 12, 2026, during the pendency of the Second Protest, Rice discovered—*yet again*—that Southern employees had begun work on-site at West Point, *despite the ongoing CICA stay and the purported termination of the Bridge Contract*.

26. Rice subsequently learned that, on January 8, 2026—*the same day the Agency filed the notice of corrective action in the Second Protest*—the Agency had secretly awarded a sole-source task order for the procured services under a preexisting contract vehicle, directing the that the work be subcontracted to Southern. However, the Agency has not published any public documents regarding this award. Notably, the Agency again failed to mention this alternate contract vehicle in the corrective action notice it filed with the GAO in the Second Protest.

27. On January 13, 2026, Rice filed a timely Agency-level protest of this improper sole-source award as an out-of-scope modification of a task order and/or the improper awarding of a task order that is out of the scope of the prime contract. Following this Agency-level protest, the Agency advised on January 13, 2026, that it was "working on a stop work order" pursuant to CICA for the procured services. However, Rice observed that Southern employees *continued* to

provide the procured services at West Point after this point—despite the Agency's representation that it was effectuating a stop work order in compliance with the law. The Agency did not confirm the stop work order had been issued until the evening of January 14, 2026.

28.    On the evening of January 15, 2026, the Agency informed Rice that it authorized Southern's continued performance on the task order during the Agency-level protest pursuant to FAR 33.103(f)(3). Rice subsequently observed Southern employees again began providing services on-site at West Point.

29.    On January 16, 2026, Rice protested the sole-source award of the unnumbered task order to Southern at the GAO, docketed as B-424208.1 (the "Third Protest"), which remains pending. As explained under the Third Protest, the task order award to Southern is unlawful as an out-of-scope modification of the underlying contract vehicle or, in the alternative, an out-of-scope task order.

30.    Shortly after Rice brought the Third Protest, on the same day, the Agency filed its Notice of CICA Stay Override Approval with the GAO. On January 20, 2026, the Agency released its Determination and Findings ("C&F") supporting that determination, which was signed on January 16, 2026. Exhibit 1. Although the D&F purports to explain the Agency's rationale, it incorporates documents that are not included in the D&F, shielding its full reasoning from scrutiny. *See id.* at 3 (referencing a mission impact statement that supposedly lays out the "[s]ignificant adverse consequences" purportedly necessitating the override, but which was not attached). As a result of this unlawful and unreasonable override, Southern has been permitted to continue performing the challenged sole-source award while the Agency's conduct and reasoning avoid scrutiny.

31.     The instant Complaint and request for a temporary restraining order, preliminary injunction, and permanent injunction followed.

**COUNT I**
**Arbitrary and Capricious Override of CICA**

32.     Rice incorporates by reference the above paragraphs as if fully stated herein.

33.     Under 5 U.S.C. § 706(2)(A), a reviewing court in a bid protest shall set aside the challenged agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Global Computer Enterprises, Inc. v. United States*, 88 Fed. 350, 399 (2009). Consistent with this standard, the Court should set aside a procuring agency's actions if: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. *Id.* In bringing a challenge on this basis, a protester is to demonstrate, by a preponderance of the evidence, that either ground justifies sustaining the protest. *Id.*

34.     The award of the instant Task Order contract marks the ***third time*** that the Agency has secretly attempted to procure the underlying services from Southern without utilizing any competitive procurement methods or considering any other qualified offerors. Further, this is the ***second time*** that the Agency has secretly made award to Southern, despite the corrective action it promised the GAO to undertake. By making each of these sole-source awards, the Agency has unfairly allowed Southern to continue to perform at West Point, despite Rice's protests to this anticompetitive procurement. However, the Agency issued a formal CICA override only in the pending Third Protest, meaning that the instant CICA override reflects—for the first time—the Agency's rationale for permitting Southern's continued performance. But the Agency has failed to share its full reasoning with Rice or the public, providing instead only a cursory summary.

35.     Under CICA, when a protest is filed within 10 days after the date of the contract award with the GAO or 5 days after an offered debriefing date, the United States is generally prohibited from engaging in "performance and related activities" during the pendency of the protest.  *See* 31 U.S.C. § 3553(d)(3)(B).  This mandatory stay is "intended to preserve the *status quo* during the pendency of the protest so that an agency would not cavalierly disregard the GAO's recommendation to cancel the challenged award."  *Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 30-31 (2006).  The CICA stay also ensures that "vendors wrongly excluded from Federal contracts would receive fair relief," *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 710 n. 8 (2006), and ultimately "guarantee[s] that plaintiffs will not be prejudiced by protests pending before the GAO," *Access Sys., Inc. v. United States*, 84 Fed. Cl. 241, 242 (2008).

36.     In light of the crucial purposes underlying the required CICA stay, Congress has permitted agencies to override the stay in only very limited circumstances.[1]  Specifically, an agency can override the stay ***only*** if either "performance of the contract is in the best interests of the United States; or urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest."  31 U.S.C. § 3553(c)(i)-(ii).  The Agency must also inform the GAO of the override and its reasoning.  *Id.*

---

[1] Because the standard for obtaining a stay override is so high, DoD issues stay overrides in only about 1.4% of procurements.  *See, e.g.*, Mark V. Arena, *et al.*, *Assessing Bid Protests of U.S. Department of Defense Procurements*, Rand Corp., 31 (Jan. 4, 2018), https://www.rand.org/content/dam/rand/pubs/research_reports/RR2300/RR2356/RAND_RR2356.pdf (last visited Jan. 20, 2026).  And even then, those overrides almost always pertain to legitimate matters of national security.  *See id.* at 31 ("However, the contracting agency can override the stay for urgent and compelling reasons, such as a national emergency or if immediate procurement is in the best interest of the United States.").

12

37.     In this case, the Agency has not provided Rice, the GAO, or the public with its full reasoning underpinning the instant CICA override.  That said, the Agency's D&F purports to provide the Agency's main reasoning for the override in this procurement.  In particular, the Agency indicates that the override is "in the best interests of the United States; and [] necessary due to urgent and compelling circumstances that significantly affect the interests of the United States, specifically, the health, life, and safety of West Point cadets."  Exhibit 1 at 3.

38.     This reasoning reflects the prior Agency's prior statements in public documentation regarding the sole-source predecessor Letter Contract and Bridge Contract.  In particular, as outlined in the November 18th J&A for the Letter Contract, the Agency represented that it has an urgent and compelling need for DFA and cook support services in order to "mitigate a potential disruption in food service operations resulting from the Government's loss of 26 positions due to the Deferred Resignation Program (DRP), retirements, and the hiring freeze."  Exhibit 2 at 3.  The Agency further attempted to justify its "urgent and compelling need" on the basis that there supposedly are not sufficient military culinary specialists to provide the services, that the Agency limits Meals-Ready-to-Eat in dining facilities, and that it is good for trainees to have adequate nutrition.  *Id.* at 3-5.

39.     In the January 6th J&A issued for the sole-source Bridge Contract, the Agency reasserted these same reasons for its purported urgent and compelling need.  *See* Exhibit 4.  Ironically, it further alleged in that J&A that Rice's First Protest created additional urgency, as the post-award protest could delay implementation of the Letter Contract.  *Id.* at 4.  This same reasoning appears in the instant D&F, which makes repeated reference to Rice's preceding protests.  *See, e.g.,* Exhibit 1 at 1-2.

40.    An Agency must consider certain factors in determining whether urgent and compelling circumstances justify a CICA override. *See Nortel Gov't*, 84 Fed. Cl. at 247 ("When asserting that urgent and compelling circumstances require immediate performance of a contract, there are several factors an agency must consider."). These factors, which arise from *Reilly's Wholesale Produce v. United States*, include: (1) "whether significant adverse consequences will necessarily occur if the stay is not overridden;" (2) "whether reasonable alternatives to the override exist;" (3) "how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare[] to the benefits associated with the approach being considered for addressing the agency's needs;" and (4) the impact of the override on competition and the integrity of the procurement system, as reflected in CICA. *See* 73 Fed. Cl. 705, 709 (2006). These factors are so helpful in guiding this analysis that this Court has, at times, considered them critical. *See, e.g.*, *Nortel Gov't*, 84 Fed. Cl. at 247 ("Failure by an agency to consider just one of these factors is fatal to an override decision based on urgent and compelling circumstances."); *but see Technica LLC v. United States*, 142 Fed. Cl. 149, 154 (2019) (explaining while "application of the *Reilly's Wholesale* test is not required," the test "identif[ies] factors that would logically be necessary or irrelevant to override decisions in general") (citations omitted).

41.    In this case, as evidenced by both the D&F and the full record of this procurement, the Agency has failed to articulate a rational basis to support these factors and did not adequately consider them in issuing the instant CICA override.

42.    Under the ***first*** factor, the Agency is required to show that significant adverse consequences would occur if the stay were not overridden. As this Court has recognized, "the types of circumstances that qualify as 'urgent and compelling' and that 'significantly affect

interests' of the government are those in which there is the 'threat of immediate harm to health, welfare, or safety.'  Those are the sorts of 'significant adverse consequences' that must be identified by an agency as necessarily occurring in the absence of an override." *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 387 (2013) (analogizing to the CICA provision allowing sole source procurements) (internal citations omitted).

43.    While the Agency's J&As for the predecessor sole-source contracts have speculated about varying possible consequences—ranging from a "potential disruption" to dining services, up to and including a hyperbolic claim of possible "mission failure"—it has never substantiated its basis for these speculative assertions.  Further, the Agency failed to include its purported analysis of the "[s]ignificant adverse consequences" in its D&F, instead referencing an unattached separate document, the Mission Impact Statement.  *See* Exhibit 1 at 3.  Rather, the only evidence of "[s]ignificant adverse consequences" within the D&F is the statement that staffing at the USMA Cadet Mess "has decreased from 82% in January 2024 to 69% in January 2026."  *Id.*  There is no other description of any adverse consequences within the D&F, outside of generalized references to the unattached Mission Impact Statement.  *See id.*

44.    As a threshold issue, it stretches credulity to believe that "significant adverse consequences" to the United States would follow from the temporary loss of 26 dining personnel.  In fact, the Agency has been operating without these personnel since at least November 2025, but no dire consequences have followed, fundamentally undermining any notion that the instant CICA stay override is justifiable.  *See, e.g., Nortel Gov't*, 84 Fed. Cl. at 250 (finding agency's CICA override, based on "alleged staffing shortages," to be irrational where "current staffing levels are adequate," concluding "while the staffing situation under the

protested contract may be preferable to defendant, defendant has failed to show that significant adverse consequences make proceeding with the contract ***necessary***") (emphasis in original).

45.     Moreover, the Agency has provided no explanation as to why the purported dire consequences can only be avoided through ***this contract***, *i.e.*, through use of the anticompetitive sole-source award that it has insisted upon.[2]  *See, e.g.*, *Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 190 (2007) (finding override arbitrary when the agency's "warning of the 'grave consequences' of not overriding the stay was not accompanied by any indication of why only through employing exclusive-use contracts could the Service avoid those consequences").   As such, the Agency has failed to establish any concrete, non-speculative consequences—let alone a threat to health, welfare, or safety—that would justify the instant CICA override.

46.     In relation to the ***second*** factor, the Agency must consider reasonable alternatives to the override.  In this respect, the D&F is woefully short on explanation.  Specifically, the Agency appears to have only considered whether utilizing Rice was a viable alternative to the override in this scenario.  Additionally, in the Agency's January 6th J&A for the sole-source Bridge Contract, the Agency purportedly considered other alternatives, such as whether the Agency could rely on military culinary specialists as a temporary stopgap.  *See* Exhibit 4 at 6-7.  However, the Agency determined this option purportedly was "not feasible due to the shortage/lack of 292Gs in the requirement's operational footprint."  *Id.*

47.     Notably, neither in the prior J&A nor the instant D&F, did the Agency consider whether it could utilize military culinary specialists ***outside*** the requirement's operational

---

[2] While the Agency appears to have briefly considered utilizing Rice for these services, it discounted Rice on the basis that "the requirement is needed now."  *See* Exhibit 1 at 4.  However, the Agency fails to address the fact that Rice had represented that it "would be able to begin work for many of the positions . . . almost instantaneously and could establish full operations in a month or less" ***back in November 2025***.

footprint to support its needs temporarily.  Similarly, the Agency never considered whether personnel outside of military culinary specialists—for example, reservists, national guard members, or other military personnel with experience in food services—could temporarily fulfill its needs.  Further, there is no mention in any of the Agency's J&As or other documents that it considered simply providing current staff with overtime to meet its needs pending award.  As a result, the Agency did not address reasonable alternatives in lieu of issuing this CICA stay.

48.    The Agency similarly failed to consider the potential cost of proceeding with the override, particularly in light of Rice's prior GAO protests.  In each of those prior protests, the Agency ultimately promised corrective action and cancelled the underlying contracts, exactly because those awards were indefensible.  In so doing, the Agency has recognized the strength of Rice's protests, which the GAO is substantially likely to sustain.  Despite this, the Agency has—for the *third time*—made the same anticompetitive award to Southern and yet again attempted to evade the required CICA stay.  The Agency's D&F dismisses the potential costs associated with this award and summarily concludes that "the benefits of overriding the stay and proceeding with performance greatly outweigh the potential costs of not doing so."  Exhibit 1 at 4.  In so doing, the Agency only considers the costs of the interim services and Rice's potential entitlement to protest costs, but fails to look any further.  However, this surface-level consideration is wholly insufficient to support the instant override.  When the GAO ultimately sustains the protest, the Agency will have increased its own financial burden by virtue of overriding the CICA stay in ways the Agency has entirely failed to consider, including through additional transition costs, wind-down costs, and termination for convenience costs.

49.    Finally, the Agency wholly failed to consider the serious ramifications for the integrity of the procurement system resulting from this stay.  As this Court has recognized, an

agency must "place its override action . . . within the broad context of federal procurement law." *Superior Helicopter*, 78 Fed. Cl. at 193. "The overarching goal of the [automatic] stay is to preserve competition in contracting and ensure a fair and effective process at the GAO." *Id.* (quoting *Advanced Sys. Dev.*, 72 Fed. Cl at 31).

50.     The Agency failed to consider the serious impact to the integrity of the procurement system in issuing the instant CICA override, particularly in light of its detrimental behavior throughout the full course of this procurement. As discussed above, the Agency has attempted to make this anticompetitive sole-source award to Southern ***three times*** at this point. Following each of those unlawful awards, Rice was compelled to spend legal fees and file a protest, merely requesting that the Agency appropriately open this procurement to competition as required under CICA. In the face of these clearly meritorious protests, rather than address Rice's arguments in good faith, the Agency artificially mooted the protests by purportedly cancelling the challenged contract. At the same time, the Agency secretly repackaged the work into a "new" contract vehicle and again made award to Southern. By virtue of this surreptitious action, the Agency effectively allowed Southern to continue performing at West Point while evading the merits of Rice's protests and keeping this procurement closed to competition. Further, the Agency repeatedly permitted Southern to continue performance under a challenged sole-source contract, even after a CICA stay should have been enacted.

51.     While the Agency now represents that there is no negative impact due to the fact that the LOGCAP contract is designed in part for urgent support needs, and thus is not an attempt to circumvent CICA, that myopic (and questionable) conclusion entirely misses the point. *See* Exhibit 1 at 3. The Agency has not considered the full course of this procurement, which has been permeated with irregularities, secrecy, and evasion. By waiting until the Third Protest to

18

implement a formal CICA override, and otherwise flouting its requirements under law, the Agency has dramatically impacted the integrity of the procurement system and undermined both the fairness and efficiency of the GAO process, leading to three separate meritorious protests to the same essential procurement. That integrity is further harmed by allowing this CICA override to stand, given the Agency's failure to establish urgent and compelling reasons for this override.

52. As an alternative to the "urgent and compelling" justification, the Agency represents that the instant override is justified as being in the "best interests of the United States." In such cases, however, an agency is required to demonstrate a "rationale—above and beyond the principle aim originally sought when [the agency] decided to engage bidders in the competitive procurement—that absolves the agency of its obligation to await the GAO's recommendation." *Nortel Gov't*, 84 Fed. Cl. at 251 (quoting *Advanced Sys. Dev.*, 72 Fed. Cl. at 31) (edits in original). A mere "preference to begin performance of the protested contract" cannot support this determination. *Id.* As demonstrated above, the Agency has not shown any rationale to sufficiently justify the instant override. Moreover, the Agency has not seriously attempted to justify its conclusion that the instant override is in the best interests of the United States. Instead, the override merely reflects its preference that Southern perform these services. This override is consistent with the Agency's actions throughout this procurement, in which it has awarded and re-awarded these services on a sole-source basis to Southern to avoid addressing Rice's protests on the merits and enable Southern's continued performance despite those meritorious protests.

53. As demonstrated, the Agency's CICA override cannot stand. The decision was arbitrary, capricious, and counter to law—a fitting capstone in a procurement that has been

plagued by arbitrary, capricious, and unlawful acts. For these reasons, the Court should find that the Agency has not met the standard for a CICA override and set aside the override.

**COUNT II**
**<u>Rice is Entitled to Preliminary and Permanent Injunctive Relief</u>**

54.   Rice incorporates by reference the above paragraphs as if fully stated herein.

55.   Rice asks for the issuance of a TRO as well as a preliminary and a permanent injunction to bar the Agency from permitting Southern to continue providing DFA and cook support services during the pendency of the Third Protest. Additionally, Rice requests that the Court prohibit the Agency from issuing award to Southern (either as a prime contractor or a directed subcontractor) for DFA and cook support services until the resolution of Rice's GAO protest on the merits, regardless of the underlying contract vehicle.

56.   To obtain preliminary injunctive relief, a protester generally must demonstrate: (a) a likelihood of success on the merits; (b) irreparable harm if the injunction is not granted; (c) that the balance of hardships favors the protester; and (d) that an injunction is in the public interest. *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983); *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 316-17 (2004).

57.   To obtain permanent injunctive relief, a protester must demonstrate: (a) success on the merits; (b) irreparable harm if the injunction is not granted; (c) that the balance of hardships favors the protester; and (d) that an injunction is in the public interest. *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013) (citation omitted).

58.   In this instance, Rice demonstrates all the factors needed for the Court to issue both a preliminary and permanent injunction.

**A. <u>Rice has Established a Likelihood of Success on the Merits</u>**

20

59.     As discussed above, the Agency has arbitrarily and capriciously overridden the required CICA stay in Rice's pending Third Protest at the GAO.  Based on the above allegations, Rice has established that it is likely to succeed in its challenge to the instant CICA override.  As such, the Court should grant preliminary injunctive relief and void the instant override.  Upon Rice succeeding on the merits, the Court should grant permanent injunctive relief and prevent the Agency from issuing any additional unlawful CICA stays in the instant procurement.

### B.   Rice Will Suffer Irreparable Harm if the Injunction is Not Granted

60.     Rice will suffer irreparable injury unless the Court sets aside the Agency's CICA override and prohibits the Agency from awarding Southern a contract for the procured services— regardless of the contractual vehicle used—during the pendency of the Third Protest.  As the Agency has made clear, its repeated sole-source awards for the procured services have been issued in lieu of appropriately competing the initial procurement.  "When assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether the plaintiff has an adequate remedy in the absence of an injunction.'"  *Reilly's Wholesale Produce*, 73 Fed. Cl. at 716-17 (quoting *Magellan Corp.* v. *United States*, 27 Fed. Cl. 446, 447 (1993)) (alteration in original). "A party suffers irreparable harm when there is no adequate remedy at law."  *C. W. Gov't Travel Inc.* v. *United States*, 61 Fed. Cl. 559, 575 (2004) (citation omitted), *aff'd*, 163 F. App'x 853 (Fed. Cir. 2005).  At this stage, there is no monetary relief available to Rice, as the Agency has not allowed Rice to bid, so it has neither bid nor proposal costs.  28 U.S.C. § 1491(b)(2)

61.     Decisions of this Court are clear that a bid protestor is irreparably harmed by its lost opportunity to compete.  *See Essex Electro Eng'rs, Inc.* v. *United States*, 3 Cl. Ct. 277, 287 (1983); *see also Reilly's Wholesale Produce*, 73 Fed. Cl. at 716-17; *Hawaiian Dredging Constr. Co.,* 59 Fed. Cl. at 317; *PGBA LLC* v. *United States*, 57 Fed. Cl. 655, 664 (2003); *Seattle Sec.*

*Servs., Inc.* v. *United States*, 45 Fed. Cl. 560, 571 (2000). "The loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and opportunity to work." *Brasfield & Gorrie, LLC v. United States*, No. 25-1140, 2025 WL 3674764, at *21 (Fed. Cl. 2025). Here, Rice lacks an adequate remedy at law and will suffer irreparable harm without the requested injunctive relief. Rice remains unwavering in its reasonable position: the Agency should satisfy its requirements through full and open competition, giving Rice a fair opportunity to compete and earn the work. If the Agency's CICA override is allowed to stand, however, Rice will be permanently deprived of the chance to compete for this award—particularly because, as noted above, the Army has indicated that the award to Southern is intended to cover only the interim period until the Army can internally staff these positions.

### C.  **The Balance of Hardships Favors Rice**

62.  When assessing the balance of hardships, the Court must examine the harm to the Government and to Rice in issuing a preliminary and permanent injunction. *Global Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 350, 457 (Fed. Cl. 2009). Here, there is nothing to balance, as all the Army's purported hardships are self-inflicted. In this case, the Army has knowingly undertaken a campaign to displace the very personnel for whom it now seeks to bypass competition and unlawfully award the contract.

63.  In a Statement by Lieuteneant General Christopher O. Monhan before the Subcommittee on Military Personnel, Committee on Armed Services, U.S. House of Representatives, First Session 119th Congress on the Services' Food Programs on 9, April, 2025, Lt. Gen. Mohan testified: "Due to Army Force Structure decisions that prioritize warfighter capabilities, the ***Army is reducing Army Culinary Specialists*** by about a third between Fiscal

Years 2025-2029." (emphasis added).  Statement by Lieutenant General Christopher O. Mohan Before the Subcommittee on Military Personnel, Committee on Armed Services, U.S. House of Reps., Personnel, 119th Congress, on the Service' Food Programs, April 9, 2025.

64.   The Army has also intentionally and actively encouraged civilian employees to resign and retire (through early retirement), and has instituted a hiring freeze.

65.   The Army's J&A demonstrates how successful the Army has been at its goal of downsizing its workforce without replacing them: "An approved J&A and the award … are needed to mitigate a potential disruption in food service operations resulting from the Government's loss of 26 positions due to the Deferred Resignation Program (DRP), retirements, and the hiring freeze."  *See* Exhibit 4 at 5.  The DRP, voluntary early retirements, and hiring freeze were and are decisions ***made by Army leadership***, not Rice.

66.   Whereas the Army's current situation is the result of its own decision making, Rice's current situation is not.  Through no fault of its own, Rice has lost and will continue to (1) lose the opportunity to compete for the DFA and cook support services at West Point; (2) lose the opportunity to earn profits associated with that work, (3) lose the opportunity to gain valuable past performance for the work it is being deprived of, (4) lose the opportunity to cross-train its workforce and gain efficiencies of scale from having two contracts in one facility, and (5) lose out on pursuing other business opportunities as a result of having to pursue the Army through multiple protests in order to have it abide by its obligations under law.

### D.   <u>The Injunction is in the Public Interest</u>

67.   "The public has an interest in honest, open, and fair competition and whenever a plaintiff is improperly excluded from that process, that interest is compromised."  *Global*

23

*Computer Enterprises, Inc.*, 88 Fed. Cl. at 461 (citations and quotations omitted). As this Court has recognized:

> The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts. Healthy competition ensures that the costs to the taxpayer will be minimized. Additionally, granting this injunction will ensure that this procurement is conducted according to all applicable procurement laws and regulations. In turn, by upholding the integrity of the procurement process, "public confidence and competition in the federal procurement process will be preserved."

*SAI Indus. Corp.* v. *United States,* 60 Fed. Cl. 731, 747 (2004) (citations omitted); *see Parcel 49C Ltd. P'ship* v. *United States*, 31 F.3d 1147, 1152-53 (Fed. Cir. 1994); *Essex Electro Eng'rs, Inc.,* 3 Cl. Ct. at 288. In other words, "there is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *ARKRAY USA, Inc. v. United States.*, 118 Fed. Cl. 129, 138 (2014) (citation omitted).

68. As discussed above, the Agency's conduct throughout this procurement failed to comply with applicable procurement regulations and fell short of the standards of ethical dealing owed to its contractors. Rather, the Agency has procedurally circumvented those regulations to arbitrarily deny Rice (as well as other qualified offerors) a fair opportunity to compete for the subject work. Due to Rice's arbitrary and unfair exclusion from this procurement, Rice's interest, as well as the public's interest as a whole, in fair competition has been compromised. Thus, the public interest requires that the Court grant the injunctive relief requested.

69. The Agency's actions throughout this procurement fundamentally undermine public trust in the integrity of the procurement system and deprive the public of fair competition. The Agency's actions do not conform with the law and regulations by which it must abide. As discussed above, the Agency has persisted in making a sole-source award for the underlying

24

services to Southern, avoiding all competitive procedures.  Moreover, the Agency delayed issuing a formal CICA override until Rice's Third Protest, despite effectively disregarding the CICA stay in each of Rice's prior protests by mooting those protests and repackaging the work in different contract vehicles.  And as shown by the Agency's reasoning in the D&F and throughout this procurement, its rationale for the override is arbitrary, capricious, and wholly unjustifiable.

70.    Due to Rice's arbitrary exclusion from this procurement, Rice's interest—as well as the public's interest as a whole—in fair competition has been compromised, and its trust in the government has been eroded.  Thus, the public interest requires that the Court grant the injunctive relief requested.

71.    For these reasons, the Court should grant a TRO as well as a preliminary injunction and a permanent injunction.

## VI.    <u>Request for Relief</u>

WHEREFORE, Plaintiff respectfully asks this Court grant judgment in its favor and grant Plaintiff the following relief:

A.  A declaration from the Court that the Agency's CICA override is void, and this override was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

B.  A TRO, a preliminary injunction, and a permanent injunction barring the Agency from implementing a CICA override during the pendency of Rice's Third Protest;

C.  A TRO, a preliminary injunction, and a permanent injunction barring the Agency from awarding any procurement for DFA and cook support services at West Point absent full and open competition, regardless of the contract vehicle;

D.  An order granting attorneys' fees; and

E.  Such other relief as the Court may deem just and proper.

January 20, 2026                              Respectfully submitted,


                                             */s/ Aron C. Beezley*
Of Counsel:                                  Aron C. Beezley
                                             Bradley Arant Boult Cummings LLP
                                             1615 L Street NW, Suite 1350
Nathaniel J. Greeson                         Washington, DC 20036
Jenna R. Mazzella                            E-mail: abeezley@bradley.com
Eugene J. Benick                             Telephone: (202) 719-8254
Bradley Arant Boult Cummings LLP             Attorney of Record for Rice Services, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, a true and correct copy of the foregoing was served on the following by electronic mail:

U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW
8th Floor
Washington, DC 20530
E-mail: nationalcourts.bidprotest@usdoj.gov

/s/ Aron C. Beezley
Aron C. Beezley