**Redacted Version**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Bid Protest

(Electronically Filed ▮▮▮ on February 3, 2026)

| | | |
|---|---|---|
| RICE SERVICES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | ▮▮▮▮▮ |
| | ) | |
| v. | ) | Case No. 1:26-cv-00109 |
| | ) | |
| THE UNITED STATES | ) | Judge Elaine D. Kaplan |
| | ) | |
| Defendant. | ) | |

## RICE SERVICES, INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MEMORANDUM IN SUPPORT

February 3, 2026

*Of Counsel:*
Nathaniel J. Greeson
Jenna R. Mazzella
Eugene J. Benick
Bradley Arant Boult Cummings LLP

Aron C. Beezley
Bradley Arant Boult Cummings LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
E-mail: abeezley@bradley.com
Telephone: (202) 719-8254
*Attorney of Record for Rice Services, Inc.*

██████████████████████████████████████████

**Table of Contents**

I.    STATEMENT OF THE ISSUES ................................................................ 2

II.    STATEMENT OF CASE AND RELEVANT FACTS ........................................... 2

    A.   The USMA................................................................................. 2

    B.   Rice Services................................................................................. 4

    C.   The Army's Prior Attempts to Award the Sole-Source Contract to Southern Directly Were Unsuccessful. ................................................................................. 4

        1.   The November 18, 2025, Award to Southern and the First Protest. ............... 5

        2.   The Second Protest at the GAO. ................................................... 5

        3.   The Task Order Award and the Subsequent Protests. ........................... 7

    D.   Issuance of CICA Stay Override. ...................................................... 8

III.    JURISDICTION AND INTERESTED PARTY STATUS ................................. 12

IV.    STANDARD OF REVIEW ................................................................ 13

    A.   Judgment on the Administrative Record. ............................................ 13

V.    ARGUMENT ................................................................................ 14

    A.   The Agency's Override Decision was Arbitrary and Capricious. ..................... 14

        1.   The Army Has Not Established Urgent and Compelling Circumstances. ......... 16

        i.   The Army Has Not Demonstrated that Significant Adverse Consequences will Occur if the Stay is Not Overridden. ...................................................... 17

        ii.   The Army Did Not Consider Whether Reasonable Alternatives to the Override Exist. 21

        iii.   The Army Gave No Consideration to the Potential Cost of Proceeding with the Override. ...................................................................... 26

        iv.   The Army Discounted the Impact of this Override on Competition and the Integrity of the Procurement System. ................................................ 28

        2.   The Army Has Not Demonstrated Overriding CICA is in the Best Interests of the United States. ...................................................................... 33

    B.   Rice is Entitled to Permanent Injunctive Relief. ................................... 35

        1.   Rice has Succeeded on the Merits ............................................. 35

        2.   Rice Will Suffer Irreparable Harm if the Injunction is Not Granted. ........... 36

        3.   The Balance of Hardships Favors Rice. ....................................... 37

        4.   The Injunction is in the Public Interest. ...................................... 38

VI.    CONCLUSION ............................................................................ 39

## Table of Authorities

**Cases**

*ARKRAY USA, Inc. v. U.S..*, 118 Fed. Cl. 129 (2014) .................................................................. 38

*Advanced Sys. Dev., Inc. v. U.S.*, 72 Fed. Cl. 25 (2006) ........................................................... 15

*ARxIUM, Inc. v. U.S.*, 136 Fed. Cl. 188 (2018) ..................................................................... 13, 14

*AT & T Corp. v. U.S.*, 133 Fed. Cl. 550 (2017) ...................................................................... 16, 20

*Bannum, Inc. v. U.S.*, 404 F.3d 1346 (Fed. Cir. 2005) ................................................................. 14

*Brasfield & Gorrie, LLC v. U.S.*, No. 25-1140, 2025 WL 3674764 (Fed. Cl. 2025) ..................... 36

*C.W. Gov't Travel Inc. v. U.S.*, 61 Fed. Cl. 559, 575 (2004) (citation omitted), *aff'd*, 163 F. App'x 853 (Fed. Cir. 2005) ................................................................................................................... 36

*C.W. Gov't Travel, Inc. v. U.S.*, 110 Fed. Cl. 462 (2013) ............................................................. 35

*E-Mgmt. Consultants, Inc. v. U.S.*, 84 Fed. Cl. 1 (2008) .............................................................. 21

*Essex Electro Eng'rs, Inc. v. U.S.*, 3 Cl. Ct. 277 (1983) ............................................................... 36

*Fort Carson Support Servs. v. U.S.*, 71 Fed. Cl. 571 (2006) .................................................. 13, 14

*Gemini Tech Services, LLC v. U.S.*, No. 25-1337C, 2025 WL 2674585 (Fed. Cl. 2025) ............. 27

*Global Computer Enterprises, Inc. v. U.S.*, 88 Fed. Cl. 350 (Fed. Cl. 2009) ......................... 37, 38

*Hawaiian Dredging Const. Co., Inc. v. U.S.*, 59 Fed. Cl. 305 (Fed. Cl. 2004) ............................. 36

*Intelligent Waves, LLC v. U.S.*, 137 Fed. Cl. 623 (2018) ....................................... 14, 20, 22, 26, 33

*Magellan Corp. v. U.S.*, 27 Fed. Cl. 446 (1993) .......................................................................... 36

*Nortel Gov't Sols., Inc. v. U.S.*, 84 Fed. Cl. 243 (2008) ..................................................... 12, 21, 33

*PGBA, LLC v. U.S.*, 57 Fed. Cl. 655 (2003) .............................................................. 14, 15, 34, 36

*Reilly's Wholesale Produce v. U.S.*, 73 Fed. Cl. 705 (2006) ......... 15, 17, 18, 22, 24, 26, 28, 29, 36

*Safeguard Base Operations, LLC v. U.S.*, 140 Fed. Cl. 670 (2018) ...................................... 27, 34

*Seattle Sec. Servs., Inc. v. U.S.*, 45 Fed. Cl. 560 (2000) .............................................................. 36

*Superior Helicopter LLC v. U.S.*, 78 Fed. Cl. 181 (2007) ................................................. 21, 27, 29

*Supreme Foodservice GmbH v. U.S.*, 109 Fed. Cl. 369 (2013) ..................... 14, 15, 16, 25, 26, 35

*Technica LLC v. U.S.*, 142 Fed. Cl. 149 (2019) ................................................................. 15, 28, 33

*URS Fed. Servs., Inc. v. U.S.*, 102 Fed. Cl. 664 (2011) ................................................................ 30

*URS Fed. Servs., Inc. v. U.S.*, 102 Fed. Cl. 674 (2012) ................................................................ 34

## Statutes

10 U.S.C. § 7453 ................................................................................................................ 2

28 U.S.C. § 1491(b) .......................................................................................................... 12

28 U.S.C. § 1491(b)(2) ................................................................................................ 35, 36

31 U.S.C. § 3553(d)(3)(C) ................................................................................................ 15

31 U.S.C. § 3553(d)(3)(C)(i)(I) ........................................................................................ 33

41 U.S.C. § 4106(f)(1)(A) ................................................................................................ 12

5 U.S.C. § 706(2)(A) ........................................................................................................ 15

## Other Authorities

H.R. Conf. Rep. No. 98–861 at 1435 (1984) .................................................................... 14

## Rules

Rule 52.1 ........................................................................................................................... 13

Rule 52.1(c) ......................................................................................................................... 1

## Regulations

FAR 1.102(a)(6) ................................................................................................................ 30

FAR 19.201(a) ................................................................................................................... 25

FAR 3.101-1 ................................................................................................................ 30, 32

FAR Overhaul 1.102(b)(3) ............................................................................................... 30

FAR Overhaul 3.101 ......................................................................................................... 30

Plaintiff, Rice Services, Inc. ("Rice"), respectfully moves the Court for judgment on the Administrative Record, pursuant to Rule 52.1(c) of the Rules for the United States Court of Federal Claims ("RCFC"), because the Administrative Record ("AR" or "Record") demonstrates that the decision by the U.S. Army Contracting Command – Rock Island ("Army" or "Agency") to override the automatic stay of performance required by the Competition in Contracting Act of 1984 ("CICA") in relation to Rice's pending protest was arbitrary, capricious, and inconsistent with law.

This case comes before the Court upon Rice's fourth protest of the instant procurement for dining facility augmentation ("DFA") and cook support services at the U.S. Army's Military Academy ("USMA"), commonly known as West Point. In each of Rice's prior protests, the U.S. Army has responded by cancelling the challenged procurement and utilizing a different contract vehicle to, time and time again, procure the services from Southern Foodservice Management, Inc.("Southern") on a sole source basis. Now, upon the Army's third sole-source award to Southern and Rice's fourth protest since November 2025, the Army has only now formally authorized an override of the mandatory CICA stay to permit Southern's continued performance pending resolution of Rice's Government Accountability Office ("GAO") protest on the merits. However, as discussed herein, this mess is entirely of the ***Army's own making***, and the Army's override decision is poorly reasoned, inconsistent with CICA, and cannot support the Army's decision. As such, the Army's override decision was arbitrary and capricious. Rice requests that this Court set aside the Army's override in this procurement and issue permanent injunctive relief to require the Army to observe the mandatory CICA stay during the pendency of Rice's GAO protest.

1

I. **STATEMENT OF THE ISSUES**

1.      Was the Army's decision to override CICA arbitrary, capricious, or inconsistent with law, where the record reveals *the Army* has understaffed the Cadet Mess for over two years, and the Army has failed to articulate the specific urgent and compelling circumstances that exist that will not allow the Army to stay the award during the pendency of the GAO protest?

2.      Was the Army's decision to override CICA as being in the best interests of the United States arbitrary, capricious, or inconsistent with law, where the override decision arises from mismanagement of the Cadet Mess by *the Army* and the override decision fails to articulate any national interest?

3.      Is Rice entitled to permanent injunctive relief to prevent continued performance of the challenged task order during the pendency of Rice's protest where the Army has articulated conflicting intentions to compete an award, and an injunction is the only way to ensure the Congressional purpose underlying CICA is respected?

II. **STATEMENT OF CASE AND RELEVANT FACTS**

A.      **The USMA.**

The USMA provides a college level course of instruction to its students (called cadets), who upon taking their oath of service and graduating, become commissioned Second Lieutenants in the Army.[1]  10 U.S.C. § 7453.  At the USMA, certain meals are eaten in Washington Hall, a 60,000 square foot dining room that can feed the entire cadet Corps at one time.[2]  During the

---

[1] Prior to a cadet's junior year, where they take an oath to fulfill their service obligation, "cadets may leave West Point for whatever reason without incurring a service obligation." *See Tuition & Service Commitment*, West Point, https://www.westpoint.edu/admissions/tuition-and-service-commitment (last visited Feb. 3, 2026).

[2] Corinna Baltos, *West Point LRC Prepares Food for 4,400 Hungry Cadets*, U.S. Army  (Jan. 22, 2025),

████████████████████████████████████████████

week, there may be mandatory meals (weekday breakfast and lunch, and Thursday dinner), which the entire Corps must attend, and optional meals.[3]  While Washington Hall serves many of the cadets' meals, it does not handle all the USMA's dining needs.  Like many college campuses, there are numerous dining options available.  On the West Point campus alone, there are nine different dining facilities.[4]  Accordingly, cadets meet their nutritional needs through a wide variety of sources in and around West Point, in addition to Washington Hall.

The service within Washington Hall is divided like a typical restaurant, with "front of the house" serving duties and "back of the house" cooking and plating duties.  Front of the house duties generally encompass ensuring the dining room is ready for service, serving the cadets, and cleaning up after the cadets.  Rice has handled the front of the house in Washington Hall since 2022.  The back of the house duties in Washington Hall at issue here involve the hiring of one Project Manager, one Equipment/Administration Specialist, five Lead Cooks, fourteen Cook IIs, and six Dining Facility Attendants.  *See* AR Tab 41b at AR 800.  While the duties of cooks and dining facility attendants may be important to a functioning back of the house, they are generally fungible within the hospitality industry and can be recruited through traditional advertising methods, such as online job boards as Southern has done for the West Point cook positions.[5]

---

https://www.army.mil/article/282673/west_point_lrc_prepares_food_for_4400_hungry_cadets (last visited Feb. 3, 2026).

[3]*Day in the Life of a Cadet*, West Point, https://www.westpoint.edu/cadet-journey/day-the-life#off-campus (last visited Feb. 3, 2026).

[4] *See Day in the Life*, *supra*, note 3.

[5] *See, e.g.*, Southern Foodservice Management Inc., *Cook II – 1st and 2nd Shift*, ZipRecruiter, https://www.ziprecruiter.com/c/Southern-Foodservice-Management-Inc/Job/Cook-II-1st-and-2nd-Shift/-in-West-Point,NY?jid=cc16d46897c9fdbe (last visited Feb. 3, 2026).

**B.    Rice Services.**

Rice is a small business based out of Tennessee with over 35 years of experience in government food service.  AR Tab 12.  Rice is the current provider of mess attendant/waiter services at the Cadet Mess in Washington Hall at the USMA.  *Id.*  Rice has held this contract since 2022.  Under this contract, Rice provides "wait staff for family style service, cafeteria style service, optional meals, mandatory meals, grab and go, [] take out service, individual plate service and special event meals."  AR Tab 9 at AR 65.  Additionally, Rice is experienced in food service, as it handled 20,872 meals per month at Edwards Air Force Base.  *See* AR Tab 9 at AR 66.  Due to this experience, Rice could compliantly fill many of the positions in the current procurement immediately and be operating at full service within a month—a fact Rice has previously communicated to the Army.  *See* AR Tabs 9 and 12.

**C.    The Army's Prior Attempts to Award the Sole-Source Contract to Southern Directly Were Unsuccessful.**

To date, Rice has four times been forced to protest the award of the DFA and cook support contract to Southern, simply seeking that the Army follow the law (CICA) and regulations (FAR) to provide full and open competition.  While the Army initially appeared to agree with Rice's position, stating in response to Rice's first GAO protest that it would compete the contract, AR Tab 15, its subsequent actions have shown otherwise—and led to two more protests at the GAO as well as an Agency-level protest immediately prior to the current GAO protest.

For reasons unclear to Rice, the Army has seemingly decided it wants to award the instant contract to Southern—regardless of law or regulation.  Indeed, when the Army realized it could not award directly to Southern, it made the current award under LOGCAP to KBR—who, lo and behold, immediately subcontracted to Southern.  This flawed procurement has compelled Rice to

4

███████████████████████████████████████████

repeatedly challenge the same unlawful award, while the Army continues to avoid opening the contract to competition as the law requires.

### 1.    The November 18, 2025, Award to Southern and the First Protest.

On November 18, 2025, the Agency published a Justification and Approval for Other than Full and Open Competition ("J&A") announcing the sole-source award of Contract No. W5168W-26-C-A002 (the "Letter Contract") to Southern for DFA and cook support services at the USMA.  AR Tab 8.  In the J&A, the Army claimed (without support) that Southern was "the only vendor with the requisite knowledge and capabilities to perform the cook support DFA services on short notice at West Point."  *Id*. at AR 58-59.

On November 21, 2025, Rice protested the sole-source award of the Letter Contract to Southern at the GAO, docketed as B-424105.1 (the "First Protest"), on a number of grounds, including the basis that the Agency failed to establish an unusual and compelling urgency to justify the sole-source award.  AR Tab 11.  In lieu of defending the protest, the Agency submitted a notice of proposed corrective action, stating in part the "Army ***will conduct a new competitive procurement for this award***."  AR Tab 16 at AR 103 (emphasis added).  In reliance on the Army's representation, on December 22, 2025, the GAO dismissed the First Protest as academic.  AR Tab 13 at AR 99-100.

### 2.    The Second Protest at the GAO.

On January 5, 2026, two weeks after the dismissal of the First Protest as "academic," Rice discovered that Southern employees had begun providing DFA and cook support services at West Point, despite the purported termination of the Letter Contract and promise to compete the requirement.  Compl. ¶ 16; AR Tab 18.  On January 6, 2026, Rice protested the sole-source award of the unnumbered bridge contract to Southern at the GAO, docketed as B-424194.1 (the

5

"Second Protest").  AR Tab 11 at AR 117-137.  In the Second Protest, Rice again contended (among other grounds) that the Army failed to establish an unusual and compelling urgency to justify the sole-source award and that the Army's purported urgency was caused by its own failure to appropriately plan.  *See generally, id.*

On January 6, 2026, the same day that the Second Protest was filed, the Army published a J&A announcing the sole-source award of Contract No. W5168W-26-C-A004 (the "Bridge Contract") for DFA and cook support services at West Point to Southern.  AR Tab 17 at AR 107-116.  The J&A revealed that the Contracting Officer had begun preparing the J&A as early as December 9, 2026, and had signed the J&A on December 15, 2026—*four days before the Army filed its notice of corrective action in the First Protest where it represented to the GAO that it would competitively resolicit the requirement*.  *Id.* at AR 108-115.  Despite this, the Army's notice of corrective action in the First Protest made no mention of the Army's intention to issue the Bridge Contract.  AR Tab 16.

In the J&A, the Army further explained that the Bridge Contract was issued to Southern pending the Army internally procuring the necessary services, stating:

> The U.S. Army Sustainment Command (ASC) has Exception to Policy (ETP) approval for hiring authority to onboard additional DAC food service staff; however, recruitment will take time. . . .

> The letter contract resulting from this J&A will cover only the minimum period of performance necessary. West Point anticipates it will regain the ability to hire civilian employees.  Once the facility can be re-staffed so it can meet capacity, it is not anticipated that additional contract support will be required.

AR Tab 17 at AR 113.

Following the filing of the Second Protest, on January 6, 2026, Rice contacted the Army to confirm that the CICA stay was appropriately implemented.  Compl. ¶ 18.  In response, however, the Army indicated that it had not implemented the stay and it ***intended*** to pursue an

6

override of the CICA stay. *Id.* In light of this representation, on January 7, 2026, Rice filed a Pre-Filing Notice with this Court, as required by Appendix C of the RCFC. *Id.* In response, the Army declined to pursue a formal CICA override.

On January 8, 2026, the Army advised the GAO that it planned to take voluntary corrective action in response to the Second Protest. In the Contracting Officer's Memorandum attached to the notice, the Agency further represented that:

> Although it is not part of this corrective action, which concerns only the protested short-term bridge contract, we will separately continue our ongoing corrective action in response to Rice Services, Inc.'s earlier GAO protest, B-424105.1, which GAO dismissed as academic on December 22, 2025.

AR Tab 37 at AR 733. In reliance on this representation, the GAO dismissed the Second Protest as academic on January 14, 2026. AR Tab 36.

### 3. The Task Order Award and the Subsequent Protests.

On January 12, 2026, during the pendency of the Second Protest, Rice discovered—*yet again*—that Southern employees had begun work on-site at West Point, despite the ongoing CICA stay and the purported termination of the Bridge Contract. Compl. ¶ 25. Rice subsequently learned that on January 8, 2026—*the same day the Army filed the notice of corrective action in the Second Protest*—the Army had secretly awarded a sole-source task order for the procured services under a preexisting contract vehicle, which was subcontracted to Southern. AR Tab 41; AR Tab 5 at AR 31. However, the Army had not published any public documents regarding this award. Compl. ¶ 26. Notably, the Army again failed to mention this alternate contract vehicle in the corrective action notice it filed with the GAO. AR Tabs 35, 37.

On January 13, 2026, Rice filed an Agency-level protest of this improper sole-source award as an out-of-scope modification of a task order and/or the awarding of a task order that is out of the scope of the prime contract. AR Tab 1. Rice requested the protest be examined one

7

level above the contracting officer, in the hope that a senior supervisor would put a stop to these continued unlawful procurements.  AR Tab 1 at AR 1-2.

Following this Agency-level protest, the Army advised Rice on January 13, 2026, that it was "working on a stop work order" for the procured services.  Compl. ¶ 27.  On the evening of January 15, 2026, the Army informed Rice that it authorized Southern's continued performance on the task order during the Agency-level protest pursuant to FAR 33.103(f)(3).  *Id.* ¶ 28.  Rice subsequently observed Southern employees again began providing services on-site at West Point. *Id.*; AR Tab 32 at 4 (stating there ha[d] been no break in [Southern's] employees' support since 12 January 2026").

On January 16, 2026, Rice protested the sole-source award of the unnumbered task order to Southern at the GAO, docketed as B-424208.1 (the "Fourth Protest"), contending that the task order is an unlawful out-of-scope modification of the underlying contract vehicle or, in the alternative, an unlawful out-of-scope task order.  AR Tab 7.  That protest remains pending.

**D.     Issuance of CICA Stay Override.**

On January 20, 2026, as part of the proceedings in the pending Fourth Protest, the Army released to the GAO its Determination and Findings ("D&F") which purports to authorize Southern's continued performance on the challenged task order despite the pending protest, overriding the automatic CICA stay.  AR Tab 23.  This D&F, signed on January 16, 2026, represents that the Army issued the task order—as well as the preceding Bridge Contract and Letter Contract—without utilizing competitive procedures due to the purported urgency of its needs.  *See id.* at AR 387-88.  The D&F further explains that the task order was issued with a four-month base period and two additional four-month option periods to allow Southern to

8

provide the services while the Army "can finish its corrective action regarding" Rice's First and Second Protests. *See id.* at AR 388.

In the D&F, the Army states that a CICA override is "in the best interests of the United States" and required "due to urgent and compelling circumstances that significantly affect the interests of the United States, specifically, the health, life, and safety of West Point cadets," which prevent the Army from waiting 100 days for a decision from the GAO. *Id.* at AR 389. The D&F goes on to explain the purported basis for this decision, stating that significant adverse consequences would arise if the stay were not overridden, there are no reasonable alternatives to the override, the benefits of the override outweigh the potential costs, and there would be no impact on the integrity of the procurement system. *Id.* at AR 389-90. The D&F also incorporated a Mission Impact Statement that further summarized the adverse consequences that would purportedly arise in the absence of the override. *Id.*; *see also* AR Tab 32.

As outlined in the D&F and Mission Impact Statement, the Army issued the instant task order to address "a chronic shortfall-staffing situation" at the USMA Cadet Mess, which was purportedly "exacerbated in recent years as a result of competition with the local labor market, the Deferred Resignation Program (DRP), the OSW hiring freeze and most recently the furlough period at the beginning of CY 2026." AR Tab 32 at AR 426. The Mission Impact Statement shows that the Government-caused staffing issues at the Cadet Mess have indeed been chronic—as early as January 2024, the Army was operating with only 73 out of 88 positions at the Cadet Mess filled. *Id.* In CY2024, the Army lost an additional five personnel in the Cadet Mess, followed by another seven personnel in CY2025. *Id.* The Mission Impact Statement notes that six of these losses in CY2025 were attributable to employees opting into the DRP—without specifying when those employees stopped working.

9

███████████████████████████████████████████

As stated in the Record, up until this point, the Army has managed staffing shortfalls at the USMA Cadet Mess through surge support from ancillary support areas and use of overtime by Cadet Mess staff.  AR Tab 32 at AR 426.  With respect to overtime usage, the Army explains that overtime "is not used to extend the actual shift lengths" but rather to enable employees to work "during periods of more compressed tasks and labor needs inside the set shift length" and "work[] through breaks."  *Id.* at AR 426-27.  This type of overtime usage, according to the Mission Impact Statement, increases employee burnout, safety risk, and absenteeism.  *Id.* at AR 426.  The Army explains that it has used, on average, 98 overtime hours per week since June 2025—approximately 1.5 hours for each of the Cadet Mess's 61 current employees.  *Id.*  In light of these Government-caused staffing shortfalls, the Army received approval to hire 21 additional personnel in exception to the ongoing hiring freeze. *Id.* at AR 426.  However, for reasons unexplained in the Record, "a significant number" of these slots were used for internal promotions rather than to hire new staff.  *Id.* at AR 426-27.

According to the Mission Impact System, while the Army has "ensured that all meals have been prepared and served on time" over the past two years, the Army now contends that the staffing shortfalls have become "an unavoidable impact to mission success."  *Id.*  In particular, the Army indicates that several current employees have told their supervisors they are prepared to resign due to their increased workload.[6]  *Id.*  Additionally, the Army states that they do not have approval to hire the number of personnel needed to "meet the maximum 86 DACs required . . . to work in the Cadet Mess."[7]  *Id.*

---

[6] The Army does not state how many "several" constitutes, nor why if these "several" employees resign—which they have not actually done—the Army is now facing "mission critical" issues that require overriding CICA during the pendency of the GAO protest.  AR Tab 32 at AR 426.

[7] It remains unclear when, if ever, the Cadet Mess was staffed with more than 73 personnel at any given time.  AR Tab 32 at AR 426.

10

███████████████████████████████████████████

Within the D&F, the Army represents that there are no reasonable alternatives to the override. AR Tab 23 at AR 340. In particular, the Army states that it could not wait the 30 days required for Rice to provide these services in full because "the requirement is needed now, and there is no other contractor on the ground capable of immediately taking on this urgent and compelling requirement."[8] *Id.* While the D&F itself considers no other alternatives short of Rice, *see id.*, the Mission Impact Statement explains that, outside of the Cadet Mess, "[t]here are no viable alternative locations where Cadets may go to receive adequate daily nutrition" without interruption to training and classes. AR Tab 32 at AR 248. The Army states, "[f]inding alternative locations organic to the USMA or otherwise provided through additional contractor support would be fundamentally unnecessary and duplicative of the costs of operating the Cadet Mess." *Id.* Accordingly, the Army concludes that "[a]dequately staffing the Cadet Mess with the necessary labor to feed the Cadets is the only cost- and time-effective means in which to achieve USMA's mission." *Id.*

The Army's consideration of the particular costs associated with the instant override is cursory. Neither the Mission Impact Statement nor the D&F specify the costs for this task order, the override, or any other alternative. AR Tab 23; AR Tab 32. In fact, the D&F shows that the Army considered only the costs of performance under the task order generally and weighed those costs against Rice's potential "protest costs" to determine that the benefits of the instant override outweigh the associated costs.[9] AR Tab 23 at AR 390.

---

[8] Rice first represented to the Agency that it could fill many positions immediately and have full operations in place in a month or less in November 2025—thus, Rice would have been able to have full operations in place by December 2025, and provide some level of instantaneous relief for the Cadet Mess's current staff. AR Tab 11.

[9] As discussed *infra*, however, the Army does not even know the costs of this award yet. *See* Section V.A.1.iii, *infra*.

11

███████████████████████████        ███████████████

The Army's review of the impacts of the instant override upon the overall integrity of procurement system is similarly brief and perfunctory. In particular, the Army touts the fact that the task order is a short-term solution pending the Army's completion of the corrective action in the First and Second Protests. *Id.* Based on this, the Army self-servingly concludes that "there is no effort by the Army to circumvent CICA." *Id.* The D&F makes no further consideration of the impact of the override on the integrity of the procurement system. *Id.*

Based on the rationale outlined in the D&F and supplemented by the Mission Impact Statement, the Army concluded that the instant override was consistent with CICA. AR Tab 23. Thus, the Agency issued the override and authorized Southern to continue performance under the challenged sole-source task order on January 16, 2026. *Id.* This Complaint followed.

## III.    JURISDICTION AND INTERESTED PARTY STATUS

The Court has jurisdiction over this action pursuant to the Tucker Act because the case involves Rice's objection to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b). As the Court has recognized, the phrase "in connection with" is "sweeping in scope." *Nortel Gov't Sols., Inc. v. U.S.*, 84 Fed. Cl. 243, 247 (2008). Because a CICA override is connected to the underlying procurement, this Court has jurisdiction to review an agency's override decision. *Id.* Additionally, although the Court is generally limited under the Federal Acquisition Streamlining Act ("FASA") in its ability to hear protests challenging the issuance of a task order, FASA includes an exception that allows the Court to hear "a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued[.]" 41 U.S.C. § 4106(f)(1)(A). As this case reflects a CICA override claim, and the Agency's most recent attempt to award this procurement on a sole-source basis reflects a task

12

███████████████████████     ████████████

order award that increases the scope of the underlying prime contract, this claim is squarely within the Court's jurisdiction.

Rice has standing because it is an interested party whose direct economic interest is harmed by the Agency's override of the CICA stay. Rice protested at the GAO the Agency's previous sole-source awards to Southern for these same services, and protested the Agency's instant task order award at both the Agency and the GAO. These timely protests triggered CICA's automatic stay, yet the Army permitted—through various contract vehicles—Southern to continue to provide the challenged services, rather than opening the procurement to competitive procedures. Ultimately, the Army formalized its override decision in the instant GAO protest. As a highly qualified offeror currently providing dining support services at both West Point (Contract No. W911SD-22-C-0003) and the U.S. Naval Academy (Contract No. N00189-17-C-Z021), Rice would have competed for the opportunity to provide DFA and cook support services at West Point, and was deprived of this opportunity by virtue of the Army's CICA override and repeated sole-source awards to Southern.

## IV.    STANDARD OF REVIEW

### A.    Judgment on the Administrative Record.

On motion for judgment on the administrative record under Rule 52.1 of the RCFC, the Court reviews whether an agency—given the disputed and undisputed facts in the record—acted in a manner that complied with the legal standards governing the challenged decision. *Fort Carson Support Servs. v. U.S.*, 71 Fed. Cl. 571, 585 (2006). "The focal point for judicial review is usually the administrative record already in existence," *see ARxIUM, Inc. v. U.S.*, 136 Fed. Cl. 188, 196 (2018), and "[f]actual findings are based on the evidence in the record as if the Court

██████████████████████████████    ████████████████

were conducting a trial on the record," *Bannum, Inc. v. U.S.*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).

In reviewing agency decisions in the context of bid protests, this Court considers whether the agency's decisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See ARxIUM, Inc.*, 136 Fed. Cl. at 196.  In particular, the Court looks to whether "an agency has examined the relevant data and articulated a satisfactory explanation for its actions." *Fort Carson*, 71 Fed. Cl. at 586 (internal citations and quotations omitted); *see also Intelligent Waves, LLC v. U.S.*, 137 Fed. Cl. 623, 625-26 (2018) ("A decision is arbitrary and capricious if: the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.") (citations omitted); *Supreme Foodservice GmbH v. U.S.*, 109 Fed. Cl. 369, 384 (2013) (describing the test as the "hard-look doctrine").  In conducting this analysis, the Court must review the agency's rationale as provided in the record and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Fort Carson*, 71 Fed. Cl. at 586 (internal citations and quotations omitted).

## V.    ARGUMENT

### A.    The Agency's Override Decision was Arbitrary and Capricious.

In promulgating CICA, Congress sought to establish "a strong enforcement mechanism . . . to insure that the mandate for competition is enforced." *PGBA, LLC v. U.S.*, 57 Fed. Cl. 655, 657 (2003) (quoting H.R. Conf. Rep. No. 98–861 at 1435 (1984)).  The automatic stay acts as a "key element" in that mechanism by preserving the status quo during the pendency of a protest

and ensuring agencies do not "cavalierly disregard the GAO's recommendation to cancel the challenged award." *Id.*; *see also Advanced Sys. Dev., Inc. v. U.S.*, 72 Fed. Cl. 25, 30-31 (2006). Because "the point of the CICA automatic stay was to enhance the GAO as a forum for bid protests, so that the integrity of the competitive procurement process could be protected," an agency can only override the stay upon a proper, written determination that makes findings consistent with 31 U.S.C. § 3553(d)(3)(C). *See Supreme Foodservice GmbH*, 109 Fed. Cl. at 385. Specifically, "[a]n agency may override an automatic stay if it notifies the GAO in writing that either performance of the contract is in the best interests of the U.S., or urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." *Technica LLC v. U.S.*, 142 Fed. Cl. 149, 153 (2019) (quotations and citations omitted); 31 U.S.C. § 3553(d)(3)(C).

This Court reviews an agency's override of a CICA stay using standards established by the Administrative Procedure Act, specifically considering whether the override was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Technica LLC*, 142 Fed. Cl. at 153 (quotations and citations omitted); 5 U.S.C. § 706(2)(A). In reviewing whether an agency's override decision is arbitrary and capricious, this Court has routinely applied the four-factor test established in *Reilly's Wholesale Produce v. U.S.*, 73 Fed. Cl. 705, 711 (2006), which considers:

> (1) "whether significant adverse consequences will necessarily occur if the stay is not overridden;" (2) "whether reasonable alternatives to the override exist;" (3) "how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare [ ] to the benefits associated with the approach being considered for addressing the agency's needs;" and (4) the impact of the override on competition and the integrity of the procurement system, as reflected in CICA.

15

███████████████████████████████████████████████

*AT & T Corp. v. U.S.*, 133 Fed. Cl. 550, 555 (2017) (citations omitted).  While these factors were initially developed to analyze an agency's determination that urgent and compelling circumstances justify an override, this Court has applied these same factors where an agency's override is purportedly based on the best interests of the United States.  *See, e.g., Supreme Foodservice GmbH*, 109 Fed. Cl. at 384 (explaining these factors "have been employed in cases reviewing overrides based on either justification").

Although application of the *Reilly's Wholesale* factors is not mandatory, courts have come to "expect" agencies to discuss the *Reilly* factors in an override decision, as the factors will "logically be necessary or irrelevant to override decisions in general."  *See Supreme Foodservice GmbH*, 109 Fed. Cl. at 385-86 (2013).  Particularly where, as here, the agency's own explanation of its override decision adheres to the *Reilly's Wholesale* factors, the Court's analysis benefits from reviewing the agency's decision in light of those factors.  AR Tab 23 at AR 389 (applying *Reilly's Wholesale* factors); *AT & T Corp.*, 133 Fed. Cl. at 556 ("[G]iven the substantive use of the *Reilly's Wholesale* factors by the Agency itself, it seems only logical that this Court use this analytical framework as well, consistent with the majority of other CICA override decisions in this Court.").

### 1.   The Army Has Not Established Urgent and Compelling Circumstances.

The Army first seeks to justify its CICA override by asserting that "urgent and compelling" circumstances preclude waiting for GAO's decision on the underlying protest.  But CICA leaves no room for such elasticity: this Court has held, by analogy to CICA's sole-source provisions, that an override on this basis demands a "threat of immediate harm to health, welfare, or safety."  *See Supreme Foodservice GmbH*, 109 Fed. Cl. at 387.  In this case, the Army repeatedly emphasizes that the challenged task order is necessary to feed West Point cadets and

16

██████████████████████████████████████████████

protect their health and welfare—but the Army never explains why its need for this task order

has become so urgent that, without it, there is an ***immediate*** threat to the health and welfare of

cadets during the pendency of the Fourth Protest.  *See* AR Tab 23; AR Tab 32.  It goes without

saying that both Rice and the Army agree that West Point cadets should have nutritious food

service.  However, as discussed herein, the Army's present need for these services simply ***does***

***not*** rise to the level of "urgent and compelling" circumstances required to justify the instant

CICA override.  *See also Reilly's Wholesale Produce*, 73 Fed. Cl. at 712 (although an agency's

goals may be "vitally important," "attaining these important goals does not give [the agency]

license to disregard Federal procurement law and, particularly, the protections designed to ensure

fair competition").

Indeed, as the AR demonstrates, the Cadet Mess has been operating with significant

staffing shortfalls for at least ***two years*** and has managed to maintain quality service during that

period through the use of overtime and surge support.  *See* AR Tab 32 at AR 426 (showing the

Army had, at most, 73 out of 88 positions at USMA filled over the past two years).  While these

alternatives may not be ideal substitutes indefinitely, the Agency ***has not*** explained why these

alternatives are not sufficient stopgaps over the next ***100 days***, when those measures have been

sufficient for the past two years.  Lacking any genuine urgent or compelling need, the Army's

CICA override stands as an arbitrary, capricious, and unlawful act—flatly at odds with the law it

is bound to follow.

<blockquote>

i.    **The Army Has Not Demonstrated that Significant Adverse Consequences will Occur if the Stay is Not Overridden.**

</blockquote>

Under the first *Reilly's Wholesale* factor, this Court looks to whether an agency has

established that "significant adverse consequences will necessarily occur if the stay is not

overridden."  73 Fed. Cl. at 711.  In reviewing an agency's description of such consequences, the

████████████████████████████

████████

Court does not merely accept an agency's representations but rather looks to whether the administrative record supports the agency's conclusions. *See id.* at 712 (finding the agency's explanations "run counter to the evidence in the administrative record").

Here, the Army's portrayal of the purported consequences of denying this override—as set forth in the D&F and the incorporated Mission Impact Statement—can be summarized plainly: Without immediate access to Southern's personnel, the Cadet Mess faces vague "safety risks in the kitchen," insufficient "oversight" to ensure basic hygiene, staff forced to resume an average of 1.5 hours of overtime per week, and the uncertain—but purportedly threatened—resignation of certain employees. *See* AR Tab 23 at AR 389-40; AR Tab 32 at AR 426-28. The Army ultimately claims that these speculative consequences would, through an unexplained chain of reasoning, result in an inability to feed cadets and a sweeping "failure of the USMA across its spectrum of operations." AR Tab 32 at AR 429. The Court should treat these purported risks with the same urgency the Army itself has shown over the past two years—that is, none. Despite invoking purportedly dire consequences, the Army has repeatedly failed to fully staff the Cadet Mess or exhaust available options to address its staffing shortages.

As the AR shows, the USMA Cadet Mess was significantly short on staff as far back as January 2024 and lost five additional staff that year. AR Tab 32 at 426. While the Cadet Mess lost seven more staff during CY2025, six of those losses were under the Government's DRP—*i.e.*, resignations that were prompted by the Government itself and that the Army was aware of well in advance, potentially as early as February 12, 2025. *See id.*; AR Tab 11 at AR 84. Despite having as much as seven months' notice that the already short-staffed Cadet Mess would become even more short-staffed towards the end of 2025, the Army did not take any action to prepare for those losses—for instance, opening a competitive procurement for these services, as Rice now

18

requests, and indeed, requested back in November 2025. Instead, even though the USMA Cadet Mess was purportedly facing consequences as severe as "mission failure," the Army waited until November 2025 to address these staffing losses and issue the sole-source Letter Contract to Southern. AR Tab 8.

Even the Army's decision to rely on Southern for these services indicates that its needs were not so urgent, and the consequences not so dire, that immediate support was necessary. Specifically, despite its purportedly urgent needs, the Army insisted on making a sole-source award to a contractor without current operations in the West Point area who was not able to begin services until January 2026, even though the Agency knew there were other contractors in the area who were ready and able to fulfill this requirement more quickly. *See* AR Tab 12.

The Army's recent use of its limited hiring exceptions further indicates that it did not consider the need for additional staff at the Cadet Mess to be so dire as to immediately threaten cadet health and welfare. In particular, while the Army was given approval to hire 21 additional personnel for the Cadet Mess and is in the final stages of filling 15 of those slots, at least 11 of those slots were allocated to *internal promotions* rather than hiring—purportedly severely needed—additional personnel. AR Tab 32 at AR 427. Thus, rather than building out its ranks to avert any claimed "mission failure," the Agency chose to reshuffle existing personnel and forgo new hires—demonstrating that military leadership did not genuinely believe the USMA kitchen faced imminent collapse, as reflected in its limited use of available hiring exceptions. *Id.*

Similarly, the Army's failure to use internal Army resources also suggests that the need for additional staff in the Cadet Mess is not so immediate that truly dire consequences will follow. While the Mission Impact Statement represents that "the Army does have active duty cooks," it further states "they are not available to support this need" because "[t]he priority

19

████████████████████████████████████████
      ████████████████████

mission for the Army's active duty cooks is to serve at deployed and field locations rather than the garrison environment of the USMA." *See* AR Tab 32 at AR 425. However, the Army does not address whether it could temporarily reprioritize the mission of current active-duty cooks to support the USMA Cadet Mess—a course of action that would be reasonable in light of the Army's representation that "mission failure" could purportedly occur ***within the next 100 days*** if additional staffing is not obtained for the Cadet Mess. *Id.* In short, the Army's rhetoric of severe consequences collapses under the weight of its own conduct over the past two years and throughout this procurement.

Even assuming, *arguendo*, that the Cadet Mess requires additional support to avoid dire consequences, the Army has wholly failed to explain why these purported consequences will occur ***in the next 100 days***, such that the Army cannot await the GAO's decision in the Fourth Protest—or better yet, simply solicit the requirement now, or at any time in the prior two years since they knew of the shortfall or in the last three months since the requirement has been under protest. The Cadet Mess has been operating at a significant staffing shortage for ***over two years*** with workable alternatives to maintain service in the meantime—the Army provides no reason to support, outside of generalities, that these staffing shortages have become so severe that the next 100 days are critical enough to justify the instant override.

Looking to both the D&F and the Mission Impact Statement, the Army's claim that it would not be able to provide sufficient nutrition to West Point cadets pending the Fourth Protest without the override is both speculative and unsupported by the Record. *See AT & T Corp.*, 133 Fed. Cl. at 556 (finding agency's assertion that "this period of 100 days is allegedly critical" to be undercut by the fact it spent significant time on market research before completing the procurement); *Intelligent Waves*, 137 Fed. Cl. at 627 (finding the agency's representation that a

20

task order was crucial to protect veterans' lives to be uncredible, explaining that "[t]he agency had ample time to consider such a lapse and take appropriate measures to avoid it" and concluding the agency's "argument is essentially that the stay must be overridden to avoid a lapse in services because it waited too late"); *see also Nortel Gov't Sols.*, 84 Fed. Cl. at 248 (finding agency's decision to override CICA stay due to staffing shortages to be arbitrary where the agency contends, at worst, that support has deteriorated).

The Army's deficient consideration of the purported adverse consequences is inherently linked to its failure to consider reasonable alternatives under the second *Reilly's Wholesale* factor. *See, e.g., E-Mgmt. Consultants, Inc. v. U.S.*, 84 Fed. Cl. 1, 7 (2008) ("[I]n light of the possible availability of reasonable alternatives, the OM does not support the conclusion that such consequences would *necessarily* occur if NHTSA did not override the automatic stay.") (emphasis in original). In particular, the Army never explains why overriding CICA is the ***only*** means by which to avoid these supposedly dire consequences. *See Superior Helicopter LLC v. U.S.*, 78 Fed. Cl. 181, 190 (2007) (finding an override arbitrary when the agency's "warning of the 'grave consequences' of not overriding the stay was not accompanied by any indication of why only through employing exclusive-use contracts could the Service avoid those consequences"). Taken together, the Army's conclusion that the instant override is necessary to avoid supposedly dire consequences in the next 100 days—including "mission failure"—is unsupported and counter to evidence in the Record. As such, the Army's conclusion is arbitrary and cannot support an override in this case.

### ii. The Army Did Not Consider Whether Reasonable Alternatives to the Override Exist.

Under the second *Reilly's Wholesale* factor, the Court looks to whether the agency considered reasonable alternatives in lieu of implementing an override. *Reilly's Wholesale*, 73

21

████████████████████████████████████████████

████████████████████

Fed. Cl. at 711.  An override decision that either fails to consider reasonable alternatives to the override, or evaluates alternatives in a manner inconsistent with facts and the administrative record, "casts considerable doubt on the rationality of [the] override decision, *id.* at 714, and demonstrates that the agency "entirely failed to consider an important aspect of the problem," *see Intelligent Waves*, 137 Fed. Cl. at 625-26 (citations omitted).  Again, in determining whether an agency's analysis was rational under the hard-look doctrine, the Court will consider whether an agency's representations are accurate and consistent with the administrative record.  *See Reilly's Wholesale*, 73 Fed. Cl. at 714 ("While, through various affidavits, defendant now asserts that the use of such BPAs would present budget, personnel and administrative difficulties, the administrative record reveals that such hurdles either did not exist at all or were readily overcome in the regions of the world where DSCP continues to provide fresh produce to commissaries.").  As demonstrated by the D&F, the Army considered (albeit, non-meaningfully) only one alternative to the instant override—namely, procuring the services from Rice.  AR Tab 23 at AR 340.

With respect to its cursory consideration of Rice, the Army noted that Rice stated (in November 2025, now almost three months ago) that it "would be able to begin work for many of the positions under the Contract almost instantaneously and could establish full operations in a month or less."  *Id.*  However, the Army dismissed Rice out of hand as a viable alternative because "the requirement is needed now," and that, without any explanation, "there is no other contractor on the ground capable of immediately taking on this urgent and compelling requirement."  *Id.*  The Army never considered whether the personnel that Rice could provide instantly would be sufficient for its needs on a temporary basis while Rice fully staffed the requirement, which would have taken a month or less.  Nor did the Army consider giving Rice

22

lead time similar to what it provided Southern at the outset of the award.  In fact, the Army does not indicate it ever inquired with Rice as to its immediate capabilities to staff the project at all.

Beyond glancing briefly in Rice's direction—and only after the Army was the subject of a protest—the Army did not address any other possible alternatives in the D&F.  For example, while the D&F discusses the measures that the Army has used in the past two years—overtime and surge support—it *does not* address whether these measures could be sustained over the next 100 days.  With respect to overtime, while the D&F describes the apparent risks associated with the Army's current overtime usage, the Army never addresses whether other ways of utilizing overtime could reduce those claimed risks in a manner sufficient to maintain service over the next 100 days.  In particular, the D&F indicates that overtime is not currently used to extend shifts but rather to allow employees to work over more concerted periods within the fixed shift schedule.  However, the Army does not address why simply extending shifts through overtime—which would enable employees to take appropriate breaks, ensure employees have sufficient time to take all necessary health and safety precautions, and limit burnout—is not a viable temporary measure.  With respect to surge support, the D&F never explains why this temporary support cannot continue over the next 100 days, or whether additional relief or incentives were considered to enable this temporary support to continue in the short term.  Further, the Army does not address whether the supervisory cooks it currently has on staff can temporarily fill the gaps within their line cooks ranks.  *See* AR Tab 32 at AR 425 (noting the relevant staffing document has only supervisory cooks, not line cooks which are currently needed).

The Army also did not consider within the D&F whether it could marshal its internal resources other than DAC resources—such as calling on National Guard or Reserve forces—to temporarily fulfill its needs during the pendency of Rice's protest.  Similarly, the Army did not

23

consider whether active-duty cooks could be reprioritized to assist West Point in the short term. The Army also did not address whether, as temporary measures, modifications could be made to West Point's set or flexible mealtimes to account for staffing shortages or whether limited changes could be made to the menu to better utilize staff time.

Beyond cursorily considering Rice, the Army gave no consideration to other outside sources to maintain services during the Rice's protest instead of using an override.  The Army gave no consideration to conducting an interim procurement, conducting a sole-source procurement with any other vender, or simplifying/streamlining its requirements for the affected region during the interim period.  *See Reilly's Wholesale*, 73 Fed. Cl. at 714 (stating, with respect to the same considerations, "it is not so much the way in which these alternatives were explored, but the fact that most of them apparently were not explored at all, that casts considerable doubt on the rationality of DeCA's override decision") (citation omitted).  Moreover, the Army never considered whether it could obtain catering from one or more off-campus sources for part or all of cadets' mandatory or optional meals, or if the USMA could institute a voucher system with off-campus food sources to provide its cafeteria staff a reprieve—even if only on weekends where cadet life appears to be significantly less structured.  As the USMA publicly touts the ability to purchase food from local dining establishments off-campus, off-campus food is already a part of cadet life.[10]

Rather than give true consideration to these obvious alternatives, the D&F summarily concludes that "[f]inding alternative locations organic to the USMA or otherwise provided through additional contractor support would be ***fundamentally unnecessary and duplicative of the costs of operating the Cadet Mess***."  *See* AR Tab 32 at AR 428 (emphasis added).  Said

---

[10] *See Day in the Life*, *supra* note 3.

another way, the Army did not determine that these alternatives were not workable, but that these alternatives are not as efficient as the instant award. *See id.* ("Adequately staffing the Cadet Mess . . . is the only ***cost- and time- effective means*** in which to achieve the USMA's mission.") (emphasis added). However, as this Court has recognized, "it undoubtedly takes more time to conduct a fair and rational competitive procurement than to follow other courses," but such considerations alone do not justify an override of CICA. *See Supreme Foodservice GmbH*, 109 Fed. Cl. at 384.

Importantly, the Army also gave no consideration to awarding this procurement to a small business, despite the Government's policy to prioritize such awards whenever possible. *See* FAR 19.201(a). The FAR permits sole-source contracts to small businesses. *See* FAR 19.808(a). If the Army was adamant about conducting a sole-source set-aside, there was a way it could lawfully have done so consistent with the Government's policy of prioritizing small businesses, such as Rice. While the Army simply asserts that no other contractors could provide the instant services, this is not borne out in the record given that the Army has been in the possession of Rice's capability statement since November 2025. AR Tab 9 at AR 63-66. As discussed above, the Army's failure to consider awarding to a small business was especially problematic in relation to Rice—which performs overlapping duties, has staff trained that could step in immediately, has performed work for the both the Army and the Navy of similar scope in the past, and has repeatedly informed the Army of its interest and capabilities.

Ultimately, through its failure to consider numerous alternatives to maintain services during Rice's protest—including several internal options and numerous outside alternatives— coupled with its conclusory discounting and rejection of Rice as an alternative, the Army entirely

██████████████████████████████████████

failed to consider an important aspect of the problem.  As such, the instant override decision was both arbitrary and capricious.  *See Intelligent Waves*, 137 Fed. Cl. at 625-26 (citation omitted).

### iii.    The Army Gave No Consideration to the Potential Cost of Proceeding with the Override.

The third *Reilly's Wholesale* factor looks to whether an agency has considered the potential costs of an override, "the costs associated with the potential that the GAO might sustain the protest, compared [ ] to the benefits associated with the approach being considered for addressing the agency's needs."  *See Reilly's Wholesale*, 73 Fed. Cl. at 711.  This not just the cost of performance and the potential payment of attorney's fees to protester's counsel before the GAO—it also includes termination costs.  *See Supreme Foodservice GmbH*, 109 Fed. Cl. at 395 (finding agency's cost evaluation insufficient where it ignored multiple items, including termination costs, explaining that "[c]osts of performance, including expenditures made in reliance on a contract, are ordinarily recovered when the government terminates a contract for convenience").  Here, however, in the Army's haste to procure and override, the Army has not actually considered the costs of performance compared to the costs associated with a sustained protest, because it does not actually possess the contractor's costs.  As reflected in the Record, the Army ***has not agreed to the cost of performance under LOGCAP***.  Rather, the Army's has a letter agreement for 27 positions (AR Tab 41b at AR 800) with an arbitrary cost cap.  *See* AR Tab 34 at AR 452-455.  Because the Army does not know what its costs will ultimately be under LOGCAP, it could not make a reasoned decision with respect to this override decision—rendering the decision arbitrary and capricious.

The letter agreement between the Procuring Contracting Officer and KBR as the prime contractor on LOGCAP states that KBR's cost proposal and certified cost or pricing data supporting its proposal is due on February 9, 2026.  AR Tab 41 at AR 742.  The "Completion of

26

Cost/Price Analysis" is scheduled to be completed by February 20, 2026.  *Id.*  The Army cannot earnestly state that "the immediate LOGCAP support to the Cadet Mess outweighs any potential costs to the Army in the event of a Sustained Protest" when it does not know the cost of performance will be.  Additionally, by having an undefinitized agreement, it has not agreed to a termination for convenience provision with KBR, and the record does not (and cannot) reflect consideration of termination for convenience costs in its cost calculus—as the clause has yet to be agreed upon.

While the Court has permitted agencies to conduct qualitative cost-benefit analyses, it has only done so where the agency evaluated the risk of delay to the costs of an adverse ruling.  *See Gemini Tech Services, LLC v. U.S.*, No. 25-1337C, 2025 WL 2674585, at *12-13 (Fed. Cl. 2025) ("[T]he Court has held that a complete quantification of costs is not necessary when there are 'significant risks that would result from not overriding the stay.'"); *see also Superior Helicopter*, 78 Fed. Cl. at 193; *Safeguard Base Operations, LLC v. U.S.*, 140 Fed. Cl. 670, 705 (2018)).  The Army did not perform such a qualitative analysis here, as it does not even mention risk.  *See* AR Tab 30 at AR 411.  The Army did not specify it was weighing the risks of not overriding the stay against potential termination and protest costs, but rather "the costs of performance" (which the Army simply does not know) and "the benefit of 100 days of LOGCAP services."  *Compare* Tab 30 at AR 411 with *Gemini Tech.*, 2025 WL 2674585, at *12-13 (stating "the D&F here explains that the costs must be considered in conjunction with the critical overcrowding situation 'increasing the risk of altercations, health crises, and potential security breaches'"); *Safeguard Base Operations*, 140 Fed. Cl. at 705 ("Even if GAO were to sustain the protest, however, the interests at risk from delay are so great that they overcome the risks to the Agency of an adverse ruling by the GAO."); *Superior Helicopter*, 78 Fed. Cl. at 193 ("The Service's findings focus

27

mainly on the obverse side of this consideration, viz., 'the significant risks that would result from not overriding the stay.'"). This was no accident, for as explained above with respect to the first *Reilly* factor, the Army fails to articulate any clear risk in the next ~80 days that will occur if CICA is not overridden. As the Army based its analysis on "the costs of performance of up to 100 days" when it does not yet have a cost proposal for the work—its explanation runs counter to the evidence before the agency and is otherwise so implausible that it renders the Army's decision arbitrary and capricious.

### iv.    The Army Discounted the Impact of this Override on Competition and the Integrity of the Procurement System.

"[T]he point of the CICA automatic stay was to enhance the GAO as a forum for bid protests, so that the integrity of the competitive procurement process could be protected." *Technica LLC*, 142 Fed. Cl. at 155 (citations omitted). Accordingly, in reviewing an agency's decision to override the CICA stay, courts have considered impacts on the integrity of the competitive procurement system under the fourth *Reilly's Wholesale* factor. *See Reilly's Wholesale*, 73 Fed. Cl. at 711. Here, however, the Army's D&F minimizes the impact of this override on competition and the integrity of the procurement system and offers an explanation that runs directly contrary to the facts in this case and reflected in the Record, framing the LOGCAP award as a short-term solution. AR Tab 23 at AR 390. On the surface alone, the Army's description of the instant award is simply not accurate. Specifically, the award ***is not*** "a short-term fix…evidenced by its (4) month base period of performance," but rather a contract that could run as long as a ***full year*** when accounting for its two four-month option periods. *Id*.

The Army builds upon this misleading description by looking solely to the length of the instant award to summarily conclude that "there is no effort by the Army to circumvent CICA." *Id.* However, whether an agency is attempting to circumvent CICA is not the relevant focus of

28

██████████████████████████████████

this factor.  Rather, an agency must "place its override action . . . within the broad context of federal procurement law," which the Army has wholly failed to do.  *See Superior Helicopter*, 78 Fed. Cl. at 193.  Notably, the Army studiously avoids placing the instant override in the context of this procurement as a whole, despite the serious concerns this course of events raises.  *See Reilly's Wholesale*, 73 Fed. Cl. at 715 (looking to agency's actions preceding the stay and indicating the agency's "lack of focus" on the integrity of the procurement system "did not begin with the override decision").  If it had done so, the Army would have been forced to acknowledge that the Army's actions throughout this procurement raise serious concerns to the integrity of the procurement system as a whole.  As this Court explained in *Reilly's Wholesale*, where protesters challenged an agency's award of a bridge contract pending resolution of the underlying protest:

> What is relevant for [] purposes [of evaluating a CICA override] is that DeCA all but ignored the fact that, in a process that reflected no new competition, it was awarding the interim contract to the same contractor to whom the challenged contract had been awarded. While in its override decision, DeCA stated that it had "honored the intent of the Competition in Contracting Act (CICA) by staying the award made under the full-term contract and instead used a limited term or 'bridge' contract," this statement seems little more than lip service, as the action actually taken was tantamount to overriding the automatic stay on the initial contract, as least in competitive terms—even in the law, actions speak louder than words. At the least, from a competition standpoint, awarding the contract to Four Seasons should have been viewed not as a first, but a last resort, undertaken only after all reasonable alternatives were fully explored. But, given the state of the administrative record, one is left with the impression—at least for the moment— that the decision to give the interim contract to Four Seasons was viewed as a way to circumvent the stay, thereby undercutting the important policy considerations underlying the collective Congressional wisdom to create the stay, in the first instance

*See id.* at 715.  Similarly, here, as discussed below, the Army has insisted on awarding and re-awarding this procurement to Southern, without exploring any other reasonable alternatives and

in so doing, undermined the integrity of the procurement system.[11]  As a result, the Army has failed to "consider an important aspect of the problem" and rendered its instant decision arbitrary and capricious.  *See URS Fed. Servs., Inc. v. U.S.*, 102 Fed. Cl. 664, 673 (2011).

The impact to the integrity of the procurement system will be profound if the CICA override stands because the Court will have ratified the Army's lack of integrity in this matter.  Integrity stands at the core of the FAR, as it is considered a guiding principle.[12]  *See* FAR 1.102(a)(6) (stating "[t]he System will-…[c]onduct business with integrity, fairness, and openness); FAR Overhaul 1.102(b)(3) (stating "[t]he Federal Acquisition System will- [c]onduct business with integrity, fairness, and openness").  The FAR also states that government business shall be "conducted in a manner above reproach" with an "impeccable" standard of conduct.  *See* FAR 3.101-1, FAR Overhaul 3.101.  This procurement has been severely lacking in integrity since the Army's first corrective action in December 2025 by misleading Rice, the GAO, and the public regarding the intentions of this procurement.[13]

As a result of Rice's First Protest filed with the GAO on November 21, 2025, the Army agreed to take corrective action on December 19, 2025.  The Army represented in relevant part: "As corrective action, the Army will terminate Letter Contract No. W5168W-26-C-A002 for the convenience of the government, and the Army will conduct a new competitive procurement for

---

[11] As supported by the declaration filed with the Complaint in this matter, despite an award to a prime contractor that is not Southern, Southern personnel have remained on site.  *See* Rice Decl. (Jan. 20, 2026)

[12] One definition of integrity is, in part: "Do what's right, legally and morally.  Integrity is a quality you develop by adhering to moral principles.  It requires that you do and say nothing that deceives others."  The Army Values, U.S. Army, https://www.army.mil/values/ (last visited Feb. 2, 2026).

[13] To be clear, Rice is not arguing anyone in the Army was operating in "bad faith" with an intent to hurt it specifically.  Rice's position is that regardless of any motive (due to malintent, being overworked, or any other conceivable reason), the Army has not been candid with Rice, the GAO, or the public about this procurement.

this award." AR Tab 15. The phrase "will conduct a new competitive procurement for this award" is unequivocal in its meaning. However, neither Rice nor the GAO were aware that four days prior, on December 15, 2025, a contracting officer for the Army executed a J&A for the Bridge Contract stating the exact opposite: "Once the facility can be re-staffed so it can meet capacity, *it is not anticipated that additional contract support will be required*." AR Tab 17 at AR 113 (emphasis added). This J&A was approved approximately three weeks later by the Alternate Advocate for Competition for the contract command approved. *Id.* at AR 116.

Rice did not learn about the December 15th J&A until the day it filed its Second Protest with the GAO, January 6, 2026, when the J&A was belatedly posted on SAM.gov. Concurrently posted with the J&A was a Sources Sought Synopsis requesting small businesses "identify their capabilities in meeting the requirement at a fair market price" for a DFA and cook support services contract—a contract that the Army suggested may never be procured. *Id*.

On January 8, 2026, the Army filed a request for dismissal based on its intention to take corrective action, which contained a memorandum from an Army contracting officer stating: "…we will separately continue our ongoing corrective action in response to Rice Services, Inc.'s earlier GAO protest, B-424105.1, which GAO dismissed as academic on December 22, 2025." AR Tab 16.

Around the time the Army made this filing, Rice became aware that Southern employees had reinitiated services at West Point, and Rice informed the GAO of the same. Rice requested the GAO provide additional time for Rice to respond to the request for dismissal in order to understand the facts on the ground. AR Tab 43. The GAO declined to allow Rice its requested extension, granting the dismissal on January 14, 2026, with the belief that the Army was progressing with its promised corrective action. AR Tab 36 at AR 731-32. What the Army did

31

not disclose is this: on the very same day it claimed to take corrective action—January 8, 2026—it had already directed the work to be performed under LOGCAP instead. *See* AR Tabs 41 and 43. As a result, when the Army told the GAO that it would "separately continue our ongoing corrective action" from the First Protest, that representation was inaccurate—or became inaccurate almost immediately—and should have been promptly corrected. By secretly diverting the work to LOGCAP, the Army cast serious doubt on its stated intent to "conduct a new competitive procurement for this award," creating the public impression—if not the reality—that its promised corrective action was little more than a façade. The Army's failure to be candid with the GAO, and its subsequent failure to update or correct the status of that corrective action, only deepens that concern.

The consequences of this conduct are real. The Army has needlessly consumed the time and resources of Rice, the GAO, other small businesses, and now this Court—not because competition was impossible, but because the Army failed to conduct this procurement with integrity and to follow through on its commitment to recompete the requirement. Whether intentional or not, the effect has been the same: Rice, the GAO, and others were misled. Rather than competing the procurement as required, the Army has repeatedly shifted the work among different contract vehicles when challenged, effectively evading the CICA stay. This procurement has strayed far from the requirement that federal acquisitions be conducted "above reproach" and with the "highest standards of conduct." FAR 3.101-1.

Equally important, when assessing "the impact of the override on competition and the integrity of the procurement system, as reflected in CICA," the warning issued in *Technica* could just as easily be written by this Court. As that court explained, allowing such an override to stand would "pull the CICA teeth from the GAO, rendering it a government body with a bark but

32

no ability to bite." *Technica LLC*, 142 Fed. Cl. at 155-56. That is precisely the danger here. At every turn, the Army has sought to evade its obligations under CICA. If this override is permitted to stand, the Army will be rewarded—and emboldened—to do so again. Federal procurements are not meant to resemble a game of whack-a-mole, in which a contractor must chase one "new" procurement after another, then challenge a CICA override, simply to compel the Government to follow the FAR and honor its own representations. Allowing this conduct to persist would undermine both competition and the integrity of the procurement system itself.

Taken together, the Army has not made a sufficient showing under any of the *Reilly's Wholesale* factors to support this override and has wholly failed to establish that urgent and compelling circumstances necessitate this override. As discussed above, because the Army has failed to show that it cannot wait 100 days of the GAO's decision—after waiting almost two years to take action in this procurement—the override is arbitrary, capricious, and cannot be permitted to stand on this basis.

### 2.    The Army Has Not Demonstrated Overriding CICA is in the Best Interests of the United States.

The Army further attempts to bolster its override decision by claiming that the override is in the best interests of the United States. *See* 31 U.S.C. § 3553(d)(3)(C)(i)(I). This Court has advised that the justification "requires something more than showing that the contract's original purpose serves the United States' interests." *Intelligent Waves*, 137 Fed. Cl. at 626; *see also Nortel Gov't Sols.*, 84 Fed. Cl. at 247-48 ("When considering a best interests determination, there must be some rationale asserted by the agency that is above and beyond its original purpose when it solicited bidders for the procurement, and 'that absolves the agency of its obligation to await the GAO's recommendation.'") (citations omitted). Moreover, an agency must consider

33

███████████████████████████████████████████

the interests of the United States writ large, not just those of the procuring agency fulfilling the purpose of the contract. *See PGBA, LLC*, 57 Fed. Cl. at 663.

Notably, the Army never specifically addresses why the instant award is in the best interests of the United States, either within the D&F or elsewhere in the Record. AR Tab 23. There is no explanation as to how the issues within the kitchen of the Cadet Mess will affect anyone outside of the USMA, much more the United States writ large. *See Safeguard Base Operations*, 140 Fed. Cl. at 708 (holding the government articulated a rational basis as being in the best interests of the United States where the government demonstrated a wider effect on all federal law enforcement training if the contract was stayed). However, to the extent the Army believes that its analysis under the *Reilly's Wholesale* factors supports this conclusion, that argument fails because, as discussed above, the Army's analysis under those factors was patently deficient.

Rather than being in the best interests of the United States, the override is merely in the interest of the Army which seeks to procure services without the burden of competitive procedures. As discussed above, the Army had many months to prepare for potential shortfalls in its kitchen staff and it knew as early as November 2025—when Rice first protested—that there were other interested contractors who were prepared to provide the instant services on short notice. However, instead of appropriately planning and exploring competitive options, the Army has repeatedly attempted to make award to Southern by relying on its self-imposed urgency to undermine the purposes of CICA—a course of action that fails to serve the government's best interest. *See URS Fed. Servs., Inc. v. U.S.*, 102 Fed. Cl. 674, 677 (2012) ("This situation, however, is entirely one brought about by Treasury's failure properly to administer this procurement by anticipating and addressing this issue much earlier in this 19–month long

34

procurement. Treasury's transparent use of its override authority to remedy its malfeasance is not in the 'best interests' of the agency or the public."). As such, the Army's override on this basis is also arbitrary and capricious, and cannot be permitted to stand.

## B. Rice is Entitled to Permanent Injunctive Relief.

Rice asks for the issuance of a permanent injunction to bar the Army from permitting Southern to continue providing DFA and cook support services during the pendency of the Fourth Protest. Additionally, Rice requests the Court prohibit the Army from issuing award to Southern for DFA and cook support services until the resolution of Rice's protest on the merits, regardless of the underlying contract vehicle, to ensure that the integrity of Rice's pending protest at the GAO is maintained.

This Court is empowered to issue permanent injunctive relief in the context of bid protests pursuant to 28 U.S.C. § 1491(b)(2). To obtain permanent injunctive relief, a protester must demonstrate: (a) success on the merits; (b) irreparable harm if the injunction is not granted; (c) that the balance of hardships favors the protester; and (d) that an injunction is in the public interest. *C.W. Gov't Travel, Inc. v. U.S.*, 110 Fed. Cl. 462, 494 (2013) (citation omitted). "None of these four factors, standing alone, is dispositive" and the Court looks to whether these factors collectively weigh in favor of the injunction. *See Supreme Foodservice GmbH*, 109 Fed. Cl. at 383. As discussed herein, all of these factors weigh in favor of issuing permanent injunctive relief to Rice.

### 1. Rice has Succeeded on the Merits.

As discussed above, the Army has arbitrarily and capriciously overridden the required CICA stay in Rice's pending Fourth Protest at the GAO. Based on the above allegations, Rice has established that its challenge to the instant CICA override will be successful. As such, the

Court should grant permanent injunctive relief, set aside the instant override, and prevent the Army from issuing any additional CICA overrides in the instant procurement.

> ### 2.    Rice Will Suffer Irreparable Harm if the Injunction is Not Granted.

Rice will suffer irreparable injury unless the Court sets aside the Army's CICA override and prohibits the Army from awarding Southern a contract for the procured services—regardless of the contractual vehicle used—during the pendency of the Fourth Protest.  As the Record has made clear, the Army's repeated sole-source awards for the procured services have been issued in lieu of appropriately competing the initial procurement.  "When assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether the plaintiff has an adequate remedy in the absence of an injunction.'"  *Reilly's Wholesale*, 73 Fed. Cl. at 716-17 (quoting *Magellan Corp. v. U.S.*, 27 Fed. Cl. 446, 447 (1993)) (alteration in original).  "A party suffers irreparable harm when there is no adequate remedy at law."  *C.W. Gov't Travel Inc. v. U.S.*, 61 Fed. Cl. 559, 575 (2004) (citation omitted), *aff'd*, 163 F. App'x 853 (Fed. Cir. 2005).  At this stage, there is no monetary relief available to Rice, as it has neither bid nor proposal costs.  28 U.S.C. § 1491(b)(2).

Prior decisions of this Court are clear that a bid protestor is irreparably harmed by its lost opportunity to compete.  *See Essex Electro Eng'rs, Inc. v. U.S.*, 3 Cl. Ct. 277, 287 (1983); *see also Reilly's Wholesale*, 73 Fed. Cl. at 716-17; *Hawaiian Dredging Const. Co., Inc. v. U.S.*, 59 Fed. Cl. 305, 317 (Fed. Cl. 2004); *PGBA LLC*, 57 Fed. Cl. at 664; *Seattle Sec. Servs., Inc. v. U.S.*, 45 Fed. Cl. 560, 571 (2000).  "The loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and opportunity to work."  *Brasfield & Gorrie, LLC v. U.S.*, No. 25-1140, 2025 WL 3674764, at *21 (Fed. Cl. 2025).  Here, Rice has no adequate remedy at law, and thus will be irreparably harmed without the requested

injunctive relief.  If the CICA override remains, there is no reason for the Army to dedicate any effort into the competition it promised months ago.  Rice remains steadfast in its request—the Army should compete its need through full and open competition, and give Rice a chance to win the business and earn the work.

### 3.    The Balance of Hardships Favors Rice.

When assessing the balance of hardships, the court must examine the harm to the Government and to Rice in issuing a preliminary and permanent injunction.  *Global Computer Enterprises, Inc. v. U.S.*, 88 Fed. Cl. 350, 457 (Fed. Cl. 2009).  Here there is nothing to balance, as ***all the Army's hardships are self-inflicted***.  In this instance, the Government deliberately dismantled the very workforce it now cites as a basis for evading competition and unlawfully procuring these services.

In a Statement by Lieuteneant General Christopher O. Monhan before the Subcommittee on Military Personnel, Committee on Armed Services, U.S. House of Representatives, First Session 119th Congress on the Services' Food Programs on 9, April, 2025, Lt. Gen. Mohan testified: "Due to Army Force Structure decisions that prioritize warfighter capabilities, ***the Army is reducing Army Culinary Specialists by about a third between Fiscal Years 2025-2029***." Statement by Lieutenant General Christopher O. Mohan Before the Subcommittee on Military Personnel, Committee on Armed Services, U.S. House of Reps., Personnel, 119th Congress, on the Service' Food Programs, April 9, 2025 (emphasis added).  The Record demonstrates how successful the Army has been at its goal of eliminating Army Culinary Specialists without replacing them, losing six personnel to the DRP alone in CY2025  AR Tab 32.  However, despite the Army's success, the Army retains numerous alternatives to maintain service at the Cadet Mess during the pendency of the protest, and as such, will suffer no hardship.

Whereas the Army's current situation is the result of *its own* decision making, Rice's current situation is not. Through no fault of its own, Rice has (1) lost an opportunity to compete for the DFA and cook support services at West Point; (2) lost an opportunity to earn potential profits associated with that work, (3) lost opportunity to gain valuable past performance for the work it is being deprived of, and (4) lost opportunity cost as a result of having to pursue the Army through multiple protests in order to have it abide by its obligations under law. As such, the balance of the hardships favors Rice.

### 4.    The Injunction is in the Public Interest.

"The public has an interest in honest, open, and fair competition and whenever a plaintiff is improperly excluded from that process, that interest is compromised." *Global Computer Enterprises, Inc.*, 88 Fed. Cl. at 461 (citations and quotations omitted). As this Court has recognized:

> The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts. Healthy competition ensures that the costs to the taxpayer will be minimized. Additionally, granting this injunction will ensure that this procurement is conducted according to all applicable procurement laws and regulations. In turn, by upholding the integrity of the procurement process, "public confidence and competition in the federal procurement process will be preserved."

*SAI Indus. Corp.* v. *U.S.,* 60 Fed. Cl. 731, 747 (2004) (citations omitted); *see Parcel 49C Ltd. P'ship v. U.S.*, 31 F.3d 1147, 1152-53 (Fed. Cir. 1994); *Essex Electro Eng'rs, Inc.*, 3 Cl. Ct. at 288. In other words, "there is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *ARKRAY USA, Inc. v. U.S..*, 118 Fed. Cl. 129, 138 (2014) (citation omitted).

The Army's actions throughout this procurement fundamentally undermine public trust in the integrity of the procurement system and deprive the public of fair competition. The Army's

actions do not conform with the law and regulations by which it must abide. Rather, the Army has procedurally circumvented those regulations to arbitrarily deny Rice (as well as other qualified offerors) a fair opportunity to compete to provide the underlying services. As discussed above, the Army has persisted in making a sole-source award for the underlying services to Southern, avoiding all competitive procedures. Moreover, the Army delayed issuing a formal CICA override until Rice's Fourth Protest, despite effectively disregarding the CICA stay in each of Rice's prior protests by mooting those protests and repackaging the work in different contract vehicles. And as shown by the Army's belated CICA override, its rationale for the override is arbitrary, capricious, and wholly unjustifiable.

Because Rice was arbitrarily excluded from this procurement, both Rice's interests and the public's broader interest in fair and open competition have been compromised. The public interest therefore compels the Court to grant the requested injunctive relief. For these reasons, permanent injunctive relief is warranted.

## VI.    CONCLUSION

The CICA override here is simply the latest chapter in the Army's effort to strong-arm a small business by forcing it through protest after protest in the hope that it will eventually give up. But Rice will not be bullied. Had the Army devoted the same energy to lawfully completing this procurement as it has towards forcing the contract to Southern through despite repeated challenges, the requirement would have been resolved long ago. Instead, the Army chose to fight CICA—and in doing so revealed the truth: staffing at the USMA Cadet Mess has been mismanaged for years, yet it continues to function nonetheless. Even when given the tools to increase staffing, the Army chose to promote rather than backfill. That choice speaks volumes. It shows that the Army itself has never treated this requirement as urgent or compelling, or as

implicating the best interests of the United States.  The Army created this problem.  It cannot now invoke "urgency" or "best interests" to escape the law.  Until the GAO rules, the Army must live with the consequences of its own making.

February 3, 2026

Of Counsel:

Nathaniel J. Greeson
Jenna R. Mazzella
Eugene J. Benick
Bradley Arant Boult Cummings LLP

Respectfully submitted,

_/s/_ Aron C. Beezley
Aron C. Beezley
Bradley Arant Boult Cummings LLP
1900 K St NW, Suite 800
Washington, DC 20006
E-mail: abeezley@bradley.com
Telephone: (202) 719-8254
Attorney of Record for Rice Services, Inc.

40